**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

'19 - CV - 02886

FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO

2019 OCT -9 PH 2: 49

JEFFREY P. COLWELL
CLERK

BY_____DEP. CLK

Civil Action No. _____

(To be supplied by the court)

Amanda Tucker _____, Plaintiff

v.

City of Aspen _____,

City of Aspen  Managing Partner ACI Affordable 1 LLL P.

Cris a White Executive Director, CHFA.

Colorado Housing and Finance Authority, Defendant(s).

*(List each named defendant on a separate line.  If you cannot fit the names of all defendants in the space provided, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names.  The names of the defendants listed in the above caption must be identical to those contained in Section B.  Do not include addresses here.)*

---

**COMPLAINT**

---

| **NOTICE** |
|---|
| Federal Rule of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files.  Under this rule, papers filed with the court should not contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number.  A filing may include only: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number.

**Plaintiff need not send exhibits, affidavits, grievances, witness statements, or any other materials to the Clerk's Office with this complaint.** |

## A.   PLAINTIFF INFORMATION

*You must notify the court of any changes to your address where case-related papers may be served by filing a notice of change of address.  Failure to keep a current address on file with the court may result in dismissal of your case.*

Amanda Tucker P.O. Box 2344, Aspen, Colorado 81612

(Name and complete mailing address)

970-820-8540   atuckermd @ yahoo.com

(Telephone number and e-mail address)

## B.   DEFENDANT(S) INFORMATION

*Please list the following information for each defendant listed in the caption of the complaint.  If more space is needed, use extra paper to provide the information requested.  The additional pages regarding defendants should be labeled "B. DEFENDANT(S) INFORMATION."*

Defendant 1:   City of Aspen , 130 Galena  Street. Aspen Co 81611

(Name and complete mailing address)

970.920.5108   Jim.true.@ city of aspen.com.

(Telephone number and e-mail address if known)

Defendant 2:   Cris White  Colorado Housing and Finance

(Name and complete mailing address)

1981 Blake St, Denver Co 80202

(Telephone number and e-mail address if known)

800-877-2432

Defendant 3: _____

(Name and complete mailing address)

_____

(Telephone number and e-mail address if known)

Defendant 4: _____

(Name and complete mailing address)

_____

(Telephone number and e-mail address if known)

**C.    JURISDICTION**

*Identify the statutory authority that allows the court to consider your claim(s): (check one)*

[✔] Federal question pursuant to 28 U.S.C. § 1331 (claims arising under the Constitution, laws, or treaties of the United States)

List the specific federal statute, treaty, and/or provision(s) of the United States Constitution that are at issue in this case.

26 USC 426 (B) , US Code 7206   IRS 2004-82

14th Amendment

[ ] Diversity of citizenship pursuant to 28 U.S.C. § 1332 (a matter between individual or corporate citizens of different states and the amount in controversy exceeds $75,000)

Plaintiff is a citizen of the State of _____.

If Defendant 1 is an individual, Defendant 1 is a citizen of _____.

If Defendant 1 is a corporation,

Defendant 1 is incorporated under the laws of _____ (name of state or foreign nation).

Defendant 1 has its principal place of business in _____ (name of state or foreign nation).

*(If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.)*

Facts

On the 29th June 2016, Aspen Pitkin County Housing Authority
(APCHA) sold the property in question to Defendant, The City of
Aspen. (Sales Agreement Exhibit 1)

The building was placed titled, mortgaged in Limited Liability
Partnership ACI Affordable 1 LLLP which was granted
approximately $7,000,000 of saleable tax credits from the
Federal Government under 42 USC (Exhibit 2 Memorandum from
APCHA)

This new partnership agreement specified that the old owner
APCHA would now be a limited (1%) and all daily operations
should be handled by defendant in the capacity as managing/
General Partner (Exhibit 3)

The LLLP agreement stated in Item 8.7 that the partnership is
liable for any acts of willful misconduct.

Defendant advertises the Federal requirements of this Section 42
property on its web site (Exhibit 4) These states that
   1) This is a senior property with priority given to seniors
      over 65. Plaintiff is 65 years and 10 months (DOB
      01/02/1954)
   2) Plaintiff's income must not exceed $43,200 for a 2 Person
      Household (plaintiff and her son)
   3) Plaintiff must satisfy one of two employment criteria
      ("working in Pitkin County at time of application "or "has
      worked in Pitkin County full time (at least 1500 hours per
      year) for 4 years immediately prior to retirement)

Plaintiff's Federal Tax Returns and Documents confirm
   1) She was working in Pitkin County at the time of
      application
   2) Her 2018 Federal Income including Social Security
      Payments is $24,000
   3) These transcripts show no retirement/ interest or other
      income.

Defendants documents are certified from the Federal Government.

Two days after lease signing in February 2018 the unauthorized limited Partner (APCHA) under the authority of the General partner and defendant engaged in a practice of knowing and intentional Federal Fraud by misrepresenting her Federal Income and Taxes to disqualify in a Federal Program that prohibits eviction.

In this case the judicial review is simple. Defendant has publicly stated (front page of the newspaper) that plaintiff's 2018 Federal Tax Returns exceed the $43,200 allowed and so she must be forcibly evicted

Plaintiff asks the court to review the enclosed tax Returns and Federal Documents to confirm that Defendant has fraudulently represented these and as a matter of urgency overturn this wrongful eviction

APCHA, the limited partner without legal authority violated US Code 7206 by claiming, under penalty that plaintiffs 2018 Income is $43,800 and not the $24,000 reflected by the documents in its possession.

The falsification and misrepresentation of Federal Tax Returns is a felony under US Code 7206

> ......shall be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation), or imprisoned not more than 3 years, or both, together with the costs of prosecution.[1]

Defendant is a corporation or limited partnership with an agreement that allows "willful conduct " liability not to exceed the value of the building which is in Aspen is around $30,000 or so.

Defendant has had plaintiffs Federal Documents by release from the outset and has refused to correct the intentional misrepresentation limited partner since January 2018 but has knowingly and intentionally committed felony fraud in order to

---

[1] US Code 7206

wrongfully evict a qualifying family from a Federal Tax Credit Program that prohibits eviction Simply because they don't like her.

In Aspen Colorado defendant has both publicly shamed plaintiff who is now homeless living in her car black balled from all affordable housing because defendant falsely represented the Federal Documents in its possession

### Fraud and False Statements

#### Declaration under penalties of perjury

Willfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter; or[2]

Defendant used this fraudulent representation of plaintiff's 2018 Federal Taxable Income of $43,800 under oath to get a County Court Ruling of Eviction. This ruling was based on fraud on the court which can be overturned at any time.

### US CODE 7206

#### Aid or assistance

Willfully aids or assists in, or procures, counsels, or advises the preparation or presentation under, or in connection with any matter arising under, the internal revenue laws, of a return affidavit, claim, or other document, which is fraudulent or is false as to any material matter............3

Defendant from Day 1 knew defendants correct income but was unwilling to uphold both the Federal Law of their Tax Credit Program they accept $7,000,000 from.
Instead they committed a violent unlawful eviction using plaintiff's pro se position against her

It is plaintiff's position that plaintiff's 2018 Federal Income including Social Security is $43,800 and since this is over $43,200 plaintiff must be forcibly evicted

---

[2] US Code 7206
[3] US Code 7206

This representation of the documents in their possession is
fraudulent, in fact plaintiff's 2018 Income including Social
Security Income is $24,000 well under the $42,300 permitted by
the Federal Government and the LIHTEC Program Plaintiff through
its executive Director Michael Kosodrosky and Deputy Director
Cindy Christensen and counsel Tom Smith (6463) all knowingly and
intentionally fraudulently represented plaintiff's Federal Tax
Returns

Plaintiff did appeal this decision but since both appeals courts
only reviewed the fraudulent sworn testimony of defendant both
appeals were denied.

Plaintiff then asked the county court for a new trial for new
evidence. Plaintiff also asked the guidance of the Office of
Attorney Regulation as to how to approach this Matter when
defendant would not accurately present Federal Documents.
Plaintiff sent these documents Plaintiff also presented this
matter to the governing Board regarding its counsel Tom Smith's
unethical practices and refusal to accurately report plaintiff's
Federal Income

While waiting for the County Court to rule on her motions.
Defendant breached the Rules of Civil Procedure and instead of
providing the leniency required for pro se litigants it received
the denial of the County Court requests by the immediate
electronic mail ,BEFORE SHE HAD RECEIVED THE COURT ORDER by US
MAIL , defendant, very violently and publicly threw a 66 year
old senior citizen and her son into the street in their night
clothes and bare feet

The scene was violent with police officers in tears. Plaintiff
then did a "victory lap" on the front page of the local
newspaper again fraudulently declaring for the public that
plaintiff's 2018 Federal Tax Returns exceeded the permissible
Federal Income of $43,200 when the Income Taxes in their
possession showed an income of $24,000. Plaintiff then issued a
press release as a victory dance of their felony fraud.
(Exhibit)

## D.   STATEMENT OF CLAIM(S)

*State clearly and concisely every claim that you are asserting in this action. For each claim, specify the right that allegedly has been violated and state all facts that support your claim, including the date(s) on which the incident(s) occurred, the name(s) of the specific person(s) involved in each claim, and the specific facts that show how each person was involved in each claim. You do not need to cite specific legal cases to support your claim(s). If additional space is needed to describe any claim or to assert additional claims, use extra paper to continue that claim or to assert the additional claim(s). Please indicate that additional paper is attached and label the additional pages regarding the statement of claims as "D. STATEMENT OF CLAIMS."*

CLAIM ONE:   See Attached

   Supporting facts:

   See Attached

4

Claim One

Felony Fraud under Cod 7206

Defendant forcibly and violently evicted plaintiff because they
fraudulently represented the 2018 Tax Returns showed an Income
of $43,800 when in fact, they show a verified Income of $24,00
certified by the Federal Government

Claim 2

Low Income Housing Tax Credit Violation Good Cause Eviction
Requirement 26 USC 42(h) (6) (E)

Defendant claims that it has satisfied the Good Cause Eviction
requirement by falsifying her Federal Documents

Claim 3
26 U.S.C. 42(h) (6) (A) No tax credit shall be allowed….

Defendant is currently in breach of this program

Claim 4
26 USC 42 (h) (6) (B)(I)

Extended Low-Income Housing Commitment
Defendant has breached this commitment and no longer qualifies
for this program

Claim 5

26 USC (h) (6) (E) (ii) (I)

…must allow individuals who meet the income limitation …. to
enforce the (good cause requirement)
For 18 months now defendant has removed this purely because they
have falsified plaintiffs tax returns in their possession


Claim 6
IRS Rule 2004-82

This Federal Rule states that the No eviction clause holds for the entirety of the program

Claim 6 26 US 42(h) Enforceable Right

Defendant receives a benefit from the Internal Revenue service only when it upholds its program to provide certain benefits such as housing the protection against eviction

Defendant has violated this right and must have the Federal Tax Credits Removed

Claim 7 42 (h) (6) (J)

The effects of non -compliance is that tax payer will be denied / have to repay the tax credits

Defendant no longer has this right to receive tax credit benefits

Claim 8

Due Process Clause of the 14th Amendment

Claim of Entitlement to the continued us and enjoyment of their homes and public housing authorities are governmental agencies whose action are subject to due process requirements

The involvement of CHFA And the Internal Revenue Service seals this right and it has been violated

Claim 9 Constitutionally Protected Property Interest

The Federal Courts have ruled that such a right does exist and defendant has violated this by virtue of the governmental involvement in this program

Claim 10 Procedural Safeguards

Here defendant attacked plaintiff from Day 1, after full approval and lease signing. They not only denied her any due

process and procedural safeguards, they actively attacked her by
falsifying her Federal Tax Returns

In this case defendant would not meet with plaintiff would not
send any of the required Federal Documents and removed any and
all Due process by falsifying Federal Documents

Claim 11 Substantial and Immediate Irreparable

Currently plaintiff is homeless with nowhere to go. Having been
evicted from a Federal Program because defendant falsified her
tax returns

Plaintiff has lived with an ongoing attack and threat of
eviction and defendant has actively attacked she and her
children by a forcible eviction while she waited for the court
to rule on her lower court motion and hear back from the OARC
and APCHA Board

Relief Requested

1. Plaintiff humbly requests an emergency ruling to over rule
   defendant's wrongful eviction based purely on a fraudulent
   representation of her 2018 Federal Taxes as plaintiff and
   her children are truly injured and at risk while this
   matter goes to trial

2. The immediate halting and disqualification and repayment
   from the Federal Low-Income Housing Tax Program

3. Felony Prosecution because of the knowing fraudulent and
   withholding and misrepresentation of Internal Revenue
   Documents with penalty

4. Immediate termination of any and all City Contractors
   (Smith) and Employees for their knowing and intentional
   misrepresentation of Federal Documents to attack a family
   they did not like

5. Any and all declaratory and punitive damages that the court
   sees fit

6. Plaintiff asks that under no circumstances should APCHA the
   perpetrator of the Federal Fraud be admitted in the action.
   As limited Partner they have no authority and under the
   LLLP the General Partner is solely responsible

7. Plaintiff respectfully asks that the court provide her with
   legal counsel

8. That the court order CHFA to immediately suspend any and
   all Federal Tax Credits to the City and County of Aspen

**E.    REQUEST FOR RELIEF**
*State the relief you are requesting or what you want the court to do.  If additional space is needed to identify the relief you are requesting, use extra paper to request relief.  Please indicate that additional paper is attached and label the additional pages regarding relief as "E. REQUEST FOR RELIEF."*

**F.    PLAINTIFF'S SIGNATURE**

I declare under penalty of perjury that I am the plaintiff in this action, that I have read this complaint, and that the information in this complaint is true and correct. *See* 28 U.S.C. § 1746; 18 U.S.C. § 1621.

Under Federal Rule of Civil Procedure 11, by signing below, I also certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending or modifying existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

_____
(Plaintiff's signature)

_____
(Date)

(Revised December 2017)

6

https://www.aspendailynews.com/news/after-yearlong-fight-apcha-tenant-evicted-from-aspen-country-inn/article_43e84bfa-e585-11e9-98d9-13ba68c14910.html

## After yearlong fight, APCHA tenant evicted from Aspen Country Inn unit

Curtis Wackerle, Aspen Daily News Staff Writer   Oct 3, 2019



The belongings of Amanda Tucker stand outside of the Aspen Country Inn on Wednesday evening as she sits nearby, inside her car, following her morning eviction. Tucker lost a battle with the Aspen-Pitkin County Housing Authority, which pursued the eviction after finding that she misrepresented her income on a rental application.

Craig Turpin/Aspen Daily News

An Aspen Country Inn resident who's been fighting the Aspen-Pitkin County Housing Authority's efforts to remove her from her unit was evicted on Wednesday morning.

Soon after, APCHA explained the reasons behind Dr. Amanda Tucker's eviction in a news release — a move that was not well received by other government officials. APCHA claims, and a local court concurred, that Tucker misrepresented her income on a rental application.

A county court judge in May issued an order allowing the eviction to go forward in Tucker's case, after she lost her appeal of an October 2018 decision in favor of APCHA. The Pitkin County Sheriff's Office, which oversees evictions as a civil matter, issued Tucker a final notice on Sept. 17 that she had to vacate the premises or face a forced eviction.

1

The sheriff's office and officials from APCHA conducted the eviction Wednesday morning with the help of hired movers who boxed up Tucker's belongings and set them on the curb outside her unit.

"It's uncomfortable. It's not something anyone wants to see or wishes to see. I speak on behalf of APCHA and myself personally — no one wants to see it come to this," APCHA Executive Director Mike Kosdrosky said.

APCHA pursued a compliance case against Tucker, a former anesthesiologist, last year after finding that she did not include her Social Security income on her tenant-qualification paperwork. Had she done so, she would have exceeded the threshold to live in the low-income rental unit.

"APCHA's mission is to house Pitkin County workers and their families who meet all employment and financial eligibility requirements," Kosdrosky said in a press release announcing the eviction. "If an individual or household fails to follow the rules, it creates inequities in a system designed to be equitable and fair for those who remain compliant. Use and occupancy of a deed-restricted unit by a household that does not qualify only deprives other qualifying households of that opportunity."

Meanwhile, APCHA's news release was deemed by some officials to be in poor taste.

"We think it's unfortunate for someone getting evicted, and I don't think their misfortune should turn into a press release or a headline," Sheriff Joe DiSalvo said, adding that he did not know APCHA would be making an announcement about the eviction until after the release went out to the public at 11:17 a.m., after the eviction was complete.

"It's disappointing and not very compassionate," DiSalvo said.

He added that whatever the circumstances of Tucker's dispute with APCHA, "It's her right to fight, to go through the court system."

Kosdrosky said he felt that sending out the press release was appropriate because Tucker's was a high-profile case that had received media attention in the past.

"We wanted to present the facts," Kosdrosky said. "We knew she would likely protest publicly and misrepresent the facts."

He added that the APCHA board has directed him to "get in front of" stories that may reflect negatively on the housing authority.

Tucker did not appear at Wednesday's APCHA board meeting to speak during public comment, as she has before to discuss her case. However, some APCHA board members agreed with DiSalvo that publicizing the eviction was inappropriate.

"It sounded triumphant and I don't think we need to gloat about work such as that, mentioning individuals, other departments [that] were not consulted," said Rachel Richards, an Aspen City Council member who serves as an alternate on the APCHA board, during a discussion about the press release at Wednesday's meeting.

DiSalvo, who also was at the meeting, added, "I do take it as a victory lap, that's how I read it."

Overseeing evictions is one of the mandated duties of the sheriff's office. "We do these, unfortunately, way too much," DiSalvo said.

While it's rare — perhaps a twice-a-year occurrence — for an eviction case to progress to the point where law enforcement and hired movers come in to remove a person's belongings, notifying residents that they must either vacate or face that outcome is much more of a regular event, DiSalvo said.

APCHA notified Tucker on June 7 that a court had ruled that her eviction can proceed. The sheriff's office sent Tucker a final notice on Sept. 17.

"She had plenty of time," Kosdrosky said. "It's not as if it was a surprise to her."

APCHA also is entangled in another high-profile fight with a resident it has gone to court to evict. A court has ruled in APCHA's favor against Lee Mulcahy, an artist APCHA says was not meeting the minimum work requirement to live in employee housing. Mulcahy has a final appeal pending, but APCHA is seeking to have a receiver appointed who would enforce the judge's decision, allowing the eviction to go forward.

Mulcahy, who has made common cause with Tucker, maintains that he will not comply with any forced eviction and would instead be taken to jail rather than cooperate, should the day of his eviction come.

In Tucker's case, APCHA has maintained that its ability to provide low-income housing at the Aspen Country Inn was jeopardized by her actions.

Aspen Country Inn is a Low-Income Housing Tax Credit property with specific tenant-eligibility criteria. If a tenant fails to report income or falsifies documentation that would put that tenant over the maximum income allowed, then APCHA must terminate the lease as soon as possible to bring the property back into compliance, according to the press release.

"Any non-compliance of a LIHTC property violates federal tax credit and Colorado Housing Finance Authority regulations and could lead to the revocation of tax credits, potentially costing the city and taxpayers millions of dollars," the release says.

*Staff writer Alcyin Bektesh contributed to this story.*

Curtis Wackerle is the editor of Aspen Daily News. He can be reached at curtis@aspendailynews.com or on Twitter @CurtisWackerle.

**Curtis Wackerle**
Editor

# Aspen Country Inn

38996 Highway 82,
Aspen, CO 81611

40 long-term rental units with rental priority given to qualified *(working in Pitkin County at the time of application or has worked in Pitkin County full time (at least 1500 hours per year) for 4 years immediately prior to retirement)* seniors 65 or older.

## Maximum Occupancy



- Studio: 2 people
- 1 bedroom: 2 people
- 2 bedroom: 4 people

## Income Limits

- 1-person household: $37,800
- 2-person household: $43,200
- 3-person household: $48,600
- 4-person household: $53,950

## Monthly Rental Rates

2

- Studio, 1 Bath: $806

- 1 bedroom, 1 Bath: $901

- 2 bedroom, 2 Bath: $1083

Security Deposit and Last Month Rent required before move-in; both equal to one month's rent. Utilities not included.

## Amenities

- Transportation: On bus route. Free fares to Aspen, Buttermilk, Aspen Airport, and Snowmass Village.

- Furnishings: Units are not furnished.

- Parking: Available for one vehicle per unit.

- Pets: No pets allowed.

# www.ezTaxReturn.com
## 2018 Federal Filing Instructions

| | | | |
|---|---|---|---|
| **Taxpayer Name:** | Amanda Tucker-Meuse | **Taxpayer SSN:** | 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 |
| **Username:** | atuckermd | **Password:** | _____ |
| **Customer email:** | atuckermd@yahoo.com | | |
| **Mailing Address:** | 38966 Highway 82 | **City/State/Zip:** | Aspen, CO 81612 |

PRINT AND SAVE THIS TAX RETURN WITH YOUR IMPORTANT DOCUMENTS! YOUR TAX RETURN WILL BE AVAILABLE FOR UNLIMITED DOWNLOADS THRU 08/30/2019. AFTER THAT,THERE WILL BE A CHARGE OF $9.95 TO ACCESS YOUR RETURN.

**INSTRUCTIONS**
INCLUDED IN THIS PACKAGE IS YOUR COMPLETED FEDERAL TAX RETURN AND ALL SUPPORTING FORMS AND SCHEDULES REQUIRED FOR FILING.

**REFUND INSTRUCTIONS**
TOTAL TAX: $0

PAYMENTS: $777

REFUND AMOUNT: $777

YOUR REFUND WILL BE MAILED TO YOU BY CHECK TO THE ADDRESS SHOWN ON YOUR TAX RETURN.

3

Form **1040** Department of the Treasury—Internal Revenue Service (99)
**U.S. Individual Income Tax Return** 20**18** OMB No. 1545-0074 | IRS Use Only—Do not write or staple in this space.

Filing status: ☒ Single ☐ Married filing jointly ☐ Married filing separately ☐ Head of household ☐ Qualifying widow(er)

| Your first name and initial | Last name | Your social security number |
|---|---|---|
| AMANDA                    D | TUCKER-MEUSE | 008 66 6709 |

Your standard deduction: ☐ Someone can claim you as a dependent ☐ You were born before January 2, 1954 ☐ You are blind

| If joint return, spouse's first name and initial | Last name | Spouse's social security number |
|---|---|---|

Spouse standard deduction: ☐ Someone can claim your spouse as a dependent ☐ Spouse was born before January 2, 1954 | ☒ Full-year health care coverage
☐ Spouse is blind ☐ Spouse itemizes on a separate return or you were dual-status alien | or exempt (see inst.)

| Home address (number and street). If you have a P.O. box, see instructions. | Apt. no. | Presidential Election Campaign |
|---|---|---|
| 38966 HIGHWAY 82 | UNIT 217 | (see inst.) ☐ You ☐ Spouse |

City, town or post office, state, and ZIP code. If you have a foreign address, attach Schedule 6. | If more than four dependents,
ASPEN, CO 81612 | see inst. and ✓ here ▶ ☐

Dependents (see instructions):

| (1) First name    Last name | (2) Social security number | (3) Relationship to you | (4) ✓ if qualifies for (see inst.): |
|---|---|---|---|
| | | | Child tax credit | Credit for other dependents |
| | | | ☐ | ☐ |
| | | | ☐ | ☐ |
| | | | ☐ | ☐ |
| | | | ☐ | ☐ |

**Sign Here**
Joint return?,
See instructions.
Keep a copy for your records.

Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

| Your signature _Amanda D Tucker_ | Date 5/15/19 | Your occupation 711510 | If the IRS sent you an Identity Protection PIN, enter it here (see inst.) |
|---|---|---|---|
| Spouse's signature. If a joint return, **both** must sign. | Date | Spouse's occupation | If the IRS sent you an Identity Protection PIN, enter it here (see inst.) |

**Paid Preparer Use Only**

| Preparer's name | Preparer's signature | | PTIN | Firm's EIN | Check if: |
|---|---|---|---|---|---|
| Firm's name ▶ | | | Phone no. | | ☐ 3rd Party Designee ☐ Self-employed |
| Firm's address ▶ | | | | | |

For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see separate instructions. | Cat. No. 11320B | Form **1040** (2018)

CQA

Form 1040 (2018) — Page **2**

| | | | | | | |
|---|---|---|---|---|---|---|
| | 1 | Wages, salaries, tips, etc. Attach Form(s) W-2 | | | 1 | 7,698 |
| Attach Form(s) W-2. Also attach Form(s) W-2G and 1099-R if tax was withheld. | 2a | Tax-exempt interest | 2a | **b** Taxable interest | 2b | |
| | 3a | Qualified dividends | 3a | **b** Ordinary dividends | 3b | |
| | 4a | IRAs, pensions, and annuities | 4a | **b** Taxable amount | 4b | |
| | 5a | Social security benefits | 5a 16,302 | **b** Taxable amount | 5b | |
| | 6 | Total income. Add lines 1 through 5. Add any amount from Schedule 1, line 22 | | | 6 | 7,698 |
| | 7 | Adjusted gross income. If you have no adjustments to income, enter the amount from line 6; otherwise, subtract Schedule 1, line 36, from line 6 | | | 7 | 7,698 |
| **Standard Deduction for—** • Single or married filing separately, $12,000 • Married filing jointly or Qualifying widow(er), $24,000 • Head of household, $18,000 • If you checked any box under Standard deduction, see instructions. | 8 | **Standard deduction or itemized deductions** (from Schedule A) | | | 8 | 12,000 |
| | 9 | Qualified business income deduction (see instructions) | | | 9 | |
| | 10 | Taxable income. Subtract lines 8 and 9 from line 7. If zero or less, enter -0- | | | 10 | |
| | 11 | a Tax (see inst.) _____ (check if any from: 1 ☐ Form(s) 8814  2 ☐ Form 4972  3 ☐ _____ ) | | | 11 | |
| | | **b Add** any amount from Schedule 2 and check here ▶ ☐ | | | | |
| | 12 | a Child tax credit/credit for other dependents | | **b Add** any amount from Schedule 3 and check here ▶ ☐ | 12 | |
| | 13 | Subtract line 12 from line 11. If zero or less, enter -0- | | | 13 | |
| | 14 | Other taxes. Attach Schedule 4 | | | 14 | |
| | 15 | Total tax. Add lines 13 and 14 | | | 15 | |
| | 16 | Federal income tax withheld from Forms W-2 and 1099 | | | 16 | 17 |
| | 17 | Refundable credits: **a** EIC (see inst.) 519 **b** Sch. 8812 **c** Form 8863 241 | | | | |
| | | **Add** any amount from Schedule 5 | | | 17 | 760 |
| | 18 | Add lines 16 and 17. These are your total payments | | | 18 | 777 |
| **Refund** Direct deposit? See instructions. | 19 | If line 18 is more than line 15, subtract line 15 from line 18. This is the amount you **overpaid** | | | 19 | 777 |
| | 20a | Amount of line 19 you want **refunded to you.** If Form 8888 is attached, check here ▶ ☐ | | | 20a | 777 |
| | ▶ b | Routing number | | ▶ c Type: ☐ Checking  ☐ Savings | | |
| | ▶ d | Account number | | | | |
| | 21 | Amount of line 19 you want **applied to your 2019 estimated tax** ▶ | 21 | | | |
| **Amount You Owe** | 22 | **Amount you owe.** Subtract line 18 from line 15. For details on how to pay, see instructions ▶ | | | 22 | |
| | 23 | Estimated tax penalty (see instructions) | 23 | | | |

Go to *www.irs.gov/Form1040* for instructions and the latest information.

Form **1040** (2018)

| Form **8863** | **Education Credits** **(American Opportunity and Lifetime Learning Credits)** ▶ Attach to Form 1040. ▶ Go to *www.irs.gov/Form8863* for instructions and the latest information. | OMB No. 1545-0074 **2018** Attachment Sequence No. **50** |
|---|---|---|

Department of the Treasury
Internal Revenue Service (99)

| Name(s) shown on return | Your social security number |
|---|---|
| AMANDA D TUCKER-MEUSE | 008 66 6709 |

> ⚠ **CAUTION**
> *Complete a separate Part III on page 2 for each student for whom you're claiming either credit before you complete Parts I and II.*

### Part I  Refundable American Opportunity Credit

| | | | |
|---|---|---|---|
| 1 | After completing Part III for each student, enter the total of all amounts from all Parts III, line 30 . | **1** | 602 |
| 2 | Enter: $180,000 if married filing jointly; $90,000 if single, head of household, or qualifying widow(er) . . . . . . . . . . . . . . | **2** 90,000 | |
| 3 | Enter the amount from Form 1040, line 7. If you're filing Form 2555, 2555-EZ, or 4563, or you're excluding income from Puerto Rico, see Pub. 970 for the amount to enter . . . . . . . . . . . . . . | **3** 7,698 | |
| 4 | Subtract line 3 from line 2. If zero or less, **stop**; you can't take any education credit . . . . . . . . . . . . . . | **4** 82,302 | |
| 5 | Enter: $20,000 if married filing jointly; $10,000 if single, head of household, or qualifying widow(er) . . . . . . . . . . . . | **5** 10,000 | |
| 6 | If line 4 is: <br>• Equal to or more than line 5, enter 1.000 on line 6 . . . . . . . . <br>• Less than line 5, divide line 4 by line 5. Enter the result as a decimal (rounded to at least three places) | **6** . 1.000 | |
| 7 | Multiply line 1 by line 6. **Caution:** If you were under age 24 at the end of the year **and** meet the conditions described in the instructions, you **can't** take the refundable American opportunity credit; skip line 8, enter the amount from line 7 on line 9, and check this box . . . . . ▶ ☐ | **7** | 602 |
| 8 | **Refundable American opportunity credit.** Multiply line 7 by 40% (0.40). Enter the amount here and on Form 1040, line 17c. Then go to line 9 below . . . . . . . . . . | **8** | 241 |

### Part II  Nonrefundable Education Credits

| | | | |
|---|---|---|---|
| 9 | Subtract line 8 from line 7. Enter here and on line 2 of the Credit Limit Worksheet (see instructions) | **9** | 361 |
| 10 | After completing Part III for each student, enter the total of all amounts from all Parts III, line 31. If zero, skip lines 11 through 17, enter -0- on line 18, and go to line 19 . . . . . . . . | **10** | |
| 11 | Enter the smaller of line 10 or $10,000 . . . . . . . . . . . . . | **11** | |
| 12 | Multiply line 11 by 20% (0.20) . . . . . . . . . . . . . . . | **12** | |
| 13 | Enter: $134,000 if married filing jointly; $67,000 if single, head of household, or qualifying widow(er) . . . . . . . . . | **13** | |
| 14 | Enter the amount from Form 1040, line 7. If you're filing Form 2555, 2555-EZ, or 4563, or you're excluding income from Puerto Rico, see Pub. 970 for the amount to enter . . . . . . . . . . . . . . | **14** | |
| 15 | Subtract line 14 from line 13. If zero or less, skip lines 16 and 17, enter -0- on line 18, and go to line 19 . . . . . . . . . . . . . . | **15** | |
| 16 | Enter: $20,000 if married filing jointly; $10,000 if single, head of household, or qualifying widow(er) . . . . . . . . . | **16** | |
| 17 | If line 15 is: <br>• Equal to or more than line 16, enter 1.000 on line 17 and go to line 18 <br>• Less than line 16, divide line 15 by line 16. Enter the result as a decimal (rounded to at least three places) . . . . . . . . . . . . . | **17** . 0.000 | |
| 18 | Multiply line 12 by line 17. Enter here and on line 1 of the Credit Limit Worksheet (see instructions) | **18** | |
| 19 | **Nonrefundable education credits.** Enter the amount from line 7 of the Credit Limit Worksheet (see instructions) here and on Schedule 3 (Form 1040), line 50 . . . . . . . . . . | **19** | |

For Paperwork Reduction Act Notice, see your tax return instructions.          Cat. No. 25379M          Form **8863** (2018)

CQA

Form 8863 (2018)

| Name(s) shown on return | Your social security number |
|---|---|
| AMANDA D TUCKER-MEUSE | 008 66 6709 |

⚠️ **CAUTION**

*Complete Part III for each student for whom you're claiming either the American opportunity credit or lifetime learning credit. Use additional copies of page 2 as needed for each student.*

**Part III**   **Student and Educational Institution Information.** See instructions.

**20**   Student name (as shown on page 1 of your tax return)

AMANDA TUCKER-MEUSE

**21**   Student social security number (as shown on page 1 of your tax return)

008   66   6709

**22**   Educational institution information (see instructions)

**a.** Name of first educational institution

**COLORADO MOUNTAIN COLLEGE**

**(1)** Address. Number and street (or P.O. box). City, town or post office, state, and ZIP code. If a foreign address, see instructions.

255 SAGE WAY HIGHWAY 82
ASPEN, CO 81611

**(2)** Did the student receive Form 1098-T from this institution for 2018?   ☒ Yes   ☐ No

**(3)** Did the student receive Form 1098-T from this institution for 2017 with box 2 filled in and box 7 checked?   ☒ Yes   ☐ No

**(4)** Enter the institution's employer identification number (EIN) if you're claiming the American opportunity credit or if you checked "Yes" in **(2)** or **(3)**. You can get the EIN from Form 1098-T or from the institution.

7 4 - 2 3 9 3 4 1 8

**b.** Name of second educational institution (if any)

**(1)** Address. Number and street (or P.O. box). City, town or post office, state, and ZIP code. If a foreign address, see instructions.

**(2)** Did the student receive Form 1098-T from this institution for 2018?   ☐ Yes   ☐ No

**(3)** Did the student receive Form 1098-T from this institution for 2017 with box 2 filled in and box 7 checked?   ☐ Yes   ☐ No

**(4)** Enter the institution's employer identification number (EIN) if you're claiming the American opportunity credit or if you checked "Yes" in **(2)** or **(3)**. You can get the EIN from Form 1098-T or from the institution.

__ __ - __ __ __ __ __ __ __

**23**   Has the Hope Scholarship Credit or American opportunity credit been claimed for this student for any 4 tax years before 2018?

☐ Yes — **Stop!** Go to line 31 for this student.   ☒ No — Go to line 24.

**24**   Was the student enrolled at least half-time for at least one academic period that began or is treated as having begun in 2018 at an eligible educational institution in a program leading towards a postsecondary degree, certificate, or other recognized postsecondary educational credential? See instructions.

☒ Yes — Go to line 25.   ☐ No — **Stop!** Go to line 31 for this student.

**25**   Did the student complete the first 4 years of postsecondary education before 2018? See instructions.

☐ Yes — **Stop!** Go to line 31 for this student.   ☒ No — Go to line 26.

**26**   Was the student convicted, before the end of 2018, of a felony for possession or distribution of a controlled substance?

☐ Yes — **Stop!** Go to line 31 for this student.   ☒ No — Complete lines 27 through 30 for this student.

⚠️ **CAUTION**

*You can't take the American opportunity credit and the lifetime learning credit for the **same student** in the same year. If you complete lines 27 through 30 for this student, don't complete line 31.*

**American Opportunity Credit**

| | | | |
|---|---|---|---|
| **27** | Adjusted qualified education expenses (see instructions). **Don't enter more than $4,000** . . . . . | 27 | 602 |
| **28** | Subtract $2,000 from line 27. If zero or less, enter -0-. . . . . . . . . . | 28 | |
| **29** | Multiply line 28 by 25% (0.25) . . . . . . . . . | 29 | |
| **30** | If line 28 is zero, enter the amount from line 27. Otherwise, add $2,000 to the amount on line 29 and enter the result. Skip line 31. Include the total of all amounts from all Parts III, line 30, on Part I, line 1 . . | 30 | 602 |

**Lifetime Learning Credit**

| | | | |
|---|---|---|---|
| **31** | Adjusted qualified education expenses (see instructions). Include the total of all amounts from all Parts III, line 31, on Part II, line 10 . . . . . . . . . . . . . . . . | 31 | |

Form **8863** (2018)

# Internal Revenue Service
## United States Department of the Treasury

```
This Product Contains Sensitive Taxpayer Data
```

## Wage and Income Transcript

| | |
|---|---|
| Request Date: | 06-05-2019 |
| Response Date: | 06-05-2019 |
| Tracking Number: | 100451678872 |

**SSN Provided:** XXX-XX-6709
**Tax Period Requested:** December, 2018

## Form W-2 Wage and Tax Statement

**Employer:**

Employer Identification Number (EIN): XXXXX4002
ASPE
PO BOX

**Employee:**

Employee's Social Security Number: XXX-XX-6709
AMAN TUCK MEUS
PO BOX

| Submission Type: | Original document |
|---|---|
| Wages, Tips and Other Compensation: | $4,726.00 |
| Federal Income Tax Withheld: | $0.00 |
| Social Security Wages: | $3,673.00 |
| Social Security Tax Withheld: | $293.00 |
| Medicare Wages and Tips: | $4,726.00 |
| Medicare Tax Withheld: | $68.00 |
| Social Security Tips: | $1,052.00 |
| Allocated Tips: | $0.00 |
| Dependent Care Benefits: | $0.00 |
| Deferred Compensation: | $0.00 |
| Code "Q" Nontaxable Combat Pay: | $0.00 |
| Code "W" Employer Contributions to a Health Savings Account: | $0.00 |
| Code "Y" Deferrals under a section 409A nonqualified Deferred Compensation plan: | $0.00 |
| Code "Z" Income under section 409A on a nonqualified Deferred Compensation plan: | $0.00 |
| Code "R" Employer's Contribution to MSA: | $0.00 |
| Code "S" Employer's Contribution to Simple Account: | $0.00 |
| Code "T" Expenses Incurred for Qualified Adoptions: | $0.00 |
| Code "V" Income from exercise of non-statutory stock options: | $0.00 |
| Code "AA" Designated Roth Contributions under a Section 401(k) Plan: | $0.00 |
| Code "BB" Designated Roth Contributions under a Section 403(b) Plan: | $0.00 |
| Code "DD" Cost of Employer-Sponsored Health Coverage: | $0.00 |
| Code "EE" Designated ROTH Contributions Under a Governmental Section 457(b) Plan: | $0.00 |
| Code "FF" Permitted benefits under a qualified small employer health | $0.00 |

4

reimbursement arrangement:

| | |
|---|---|
| Code "GG" Income from Qualified Equity Grants Under Section 83(i): | $0.00 |
| Code "HH" Aggregate Deferrals Under Section 83(i) Elections as of the Close of the Calendar Year: | $0.00 |
| Third Party Sick Pay Indicator: | Unanswered |
| Retirement Plan Indicator: | Unanswered |
| Statutory Employee: | Not Statutory Employee |
| W2 Submission Type: | Original |
| W2 WHC SSN Validation Code: | Correct SSN |

# Form W-2 Wage and Tax Statement

## Employer:

Employer Identification Number (EIN): XXXXX2890

ASPE

0235 H

## Employee:

Employee's Social Security Number: XXX-XX-6709

AMAN TUCK MEUS

PO BOX

| | |
|---|---|
| Submission Type: | Original document |
| Wages, Tips and Other Compensation: | $2,042.00 |
| Federal Income Tax Withheld: | $0.00 |
| Social Security Wages: | $0.00 |
| Social Security Tax Withheld: | $0.00 |
| Medicare Wages and Tips: | $2,220.00 |
| Medicare Tax Withheld: | $32.00 |
| Social Security Tips: | $0.00 |
| Allocated Tips: | $0.00 |
| Dependent Care Benefits: | $0.00 |
| Deferred Compensation: | $0.00 |
| Code "Q" Nontaxable Combat Pay: | $0.00 |
| Code "W" Employer Contributions to a Health Savings Account: | $0.00 |
| Code "Y" Deferrals under a section 409A nonqualified Deferred Compensation plan: | $0.00 |
| Code "Z" Income under section 409A on a nonqualified Deferred Compensation plan: | $0.00 |
| Code "R" Employer's Contribution to MSA: | $0.00 |
| Code "S" Employer's Contribution to Simple Account: | $0.00 |
| Code "T" Expenses Incurred for Qualified Adoptions: | $0.00 |
| Code "V" Income from exercise of non-statutory stock options: | $0.00 |
| Code "AA" Designated Roth Contributions under a Section 401(k) Plan: | $0.00 |
| Code "BB" Designated Roth Contributions under a Section 403(b) Plan: | $0.00 |
| Code "DD" Cost of Employer-Sponsored Health Coverage: | $0.00 |
| Code "EE" Designated ROTH Contributions Under a Governmental Section 457(b) Plan: | $0.00 |
| Code "FF" Permitted benefits under a qualified small employer health reimbursement arrangement: | $0.00 |
| Code "GG" Income from Qualified Equity Grants Under Section 83(i): | $0.00 |
| Code "HH" Aggregate Deferrals Under Section 83(i) Elections as of the Close of the Calendar Year: | $0.00 |
| Third Party Sick Pay Indicator: | Unanswered |

Retirement Plan Indicator:                                          Yes - retirement
                                                                              plan
Statutory Employee:                                                   Not Statutory
                                                                         Employee
W2 Submission Type:                                                        Original
W2 WHC SSN Validation Code:                                             Correct SSN

# Form W-2 Wage and Tax Statement

## **Employer:**

Employer Identification Number (EIN): XXXXX6325
SKYW
444 S

## **Employee:**

Employee's Social Security Number: XXX-XX-6709
AMAN TUCK MEUS
PO BOX

| Submission Type: | Original document |
|---|---|
| Wages, Tips and Other Compensation: | $930.00 |
| Federal Income Tax Withheld: | $16.00 |
| Social Security Wages: | $930.00 |
| Social Security Tax Withheld: | $57.00 |
| Medicare Wages and Tips: | $930.00 |
| Medicare Tax Withheld: | $13.00 |
| Social Security Tips: | $0.00 |
| Allocated Tips: | $0.00 |
| Dependent Care Benefits: | $0.00 |
| Deferred Compensation: | $0.00 |
| Code "Q" Nontaxable Combat Pay: | $0.00 |
| Code "W" Employer Contributions to a Health Savings Account: | $0.00 |
| Code "Y" Deferrals under a section 409A nonqualified Deferred Compensation plan: | $0.00 |
| Code "Z" Income under section 409A on a nonqualified Deferred Compensation plan: | $0.00 |
| Code "R" Employer's Contribution to MSA: | $0.00 |
| Code "S" Employer's Contribution to Simple Account: | $0.00 |
| Code "T" Expenses Incurred for Qualified Adoptions: | $0.00 |
| Code "V" Income from exercise of non-statutory stock options: | $0.00 |
| Code "AA" Designated Roth Contributions under a Section 401(k) Plan: | $0.00 |
| Code "BB" Designated Roth Contributions under a Section 403(b) Plan: | $0.00 |
| Code "DD" Cost of Employer-Sponsored Health Coverage: | $0.00 |
| Code "EE" Designated ROTH Contributions Under a Governmental Section 457(b) Plan: | $0.00 |
| Code "FF" Permitted benefits under a qualified small employer health reimbursement arrangement: | $0.00 |
| Code "GG" Income from Qualified Equity Grants Under Section 83(i): | $0.00 |
| Code "HH" Aggregate Deferrals Under Section 83(i) Elections as of the Close of the Calendar Year: | $0.00 |
| Third Party Sick Pay Indicator: | Unanswered |
| Retirement Plan Indicator: | Unanswered |
| Statutory Employee: | Not Statutory Employee |
| W2 Submission Type: | Original |

W2 WHC SSN Validation Code:                                          Correct SSN

# Form SSA-1099 Benefits Statement

**Payer:**

Payer's Federal Identification Number (FIN): XXXXX4813
SOCI

**Payee:**

Payee's Identification Number: XXX-XX-6709
AMAN TUCK MEUS
PO BOX

| | |
|---|---|
| Submission Type: | Original document |
| Account Number (Optional): | N/A |
| Pensions and Annuities (Total Benefits Paid): | $16,302.00 |
| Tax Withheld: | 0.00 |
| Repayments: | $1,254.00 |
| Workman's Compensation Offset: | 0.00 |
| TY 2017 Payments: | 0.00 |
| TY 2016 Payments: | 0.00 |
| TY 2015 Payments: | 0.00 |
| TY 2014 Payments: | 0.00 |
| Trust Fund Indicator: | Retirement |
| SSA/RRB Payments: | Either RRB or SSA payments |

# Form 1098-T

**Payer:**

Payer's Federal Identification Number (FIN): XXXXX7768
COLO
802 GR

**Recipient:**

Recipient's Identification Number: XXX-XX-6709
AMAN TUCK
PO BOX

| | |
|---|---|
| Submission Type: | Original document |
| Account Number (Optional): | XXX5400 |
| Qualified Tuition and Related Expense: | $382.00 |
| Scholarships or Grants: | $0.00 |
| Half Time Student Indicator: | Grtr than or Eq to Half Time Student |
| Graduate Student Indicator: | Not a Graduate Student |
| Academic Period Code: | Academic Period Box Not Checked |
| Method of Reporting Indicator: | Change in Reporting Method from the Previous year |
| TIN Checkbox: | box marked |
| Adjustments Made for Prior Year: | $0.00 |
| Adjustments to Scholarships or Grants for a Prior Year: | $0.00 |
| Reimbursements/Refunds from an Insurance Contract: | $0.00 |

This Product Contains Sensitive Taxpayer Data

Subclause (II) shall not apply to the extent more stringent requirements are provided in the agreement or in State law.

**(ii) Eviction, etc. of existing low-income tenants not permitted** The termination of an extended use period under clause (i) shall not be construed to permit before the close of the 3-year period following such termination—

**(I)** the eviction or the termination of tenancy (other than for good cause) of an existing tenant of any low-income unit, or

**(II)** any increase in the gross rent with respect to such unit not otherwise permitted under this section.

**(F) Qualified contract** For purposes of subparagraph (E), the term "qualified contract" means a bona fide contract to acquire (within a reasonable period after the contract is entered into) the nonlow-income portion of the building for fair market value and the low-income portion of the building for an amount not less than the applicable fraction (specified in the extended low-income housing commitment) of—

**(i)** the sum of—

**(I)** the outstanding indebtedness secured by, or with respect to, the building,

**(II)** the adjusted investor equity in the building, plus

**(III)** other capital contributions not reflected in the amounts described in subclause (I) or (II), reduced by

**(ii)** cash distributions from (or available for distribution from) the project.

The Secretary shall prescribe such regulations as may be necessary or appropriate to carry out this paragraph, including regulations to prevent the manipulation of the amount determined under the preceding sentence.

**(G) Adjusted investor equity**

**(i) In general** For purposes of subparagraph (E), the term "adjusted investor equity" means, with respect to any calendar

**(i) DEFINITIONS AND SPECIAL RULES** For purposes of this section—

### (1) COMPLIANCE PERIOD

The term "compliance period" means, with respect to any building, the period of 15 taxable years beginning with the 1st taxable year of the credit period with respect thereto.

### (2) DETERMINATION OF WHETHER BUILDING IS FEDERALLY SUBSIDIZED

#### (A) In general

Except as otherwise provided in this paragraph, for purposes of subsection (b)(1), a new building shall be treated as federally subsidized for any taxable year if, at any time during such taxable year or any prior taxable year, there is or was outstanding any obligation the interest on which is exempt from tax under section 103 the proceeds of which [1] are or were used (directly or indirectly) with respect to such building or the operation thereof.

#### (B) Election to reduce eligible basis by proceeds of obligations

A tax-exempt obligation shall not be taken into account under subparagraph (A) if the taxpayer elects to exclude from the eligible basis of the building for purposes of subsection (d) the proceeds of such obligation.

#### (C) Special rule for subsidized construction financing

Subparagraph (A) shall not apply to any tax-exempt obligation used to provide construction financing for any building if—

**(i)** such obligation (when issued) identified the building for which the proceeds of such obligation would be used, and

**(ii)** such obligation is redeemed before such building is placed in service.

### (3) LOW-INCOME UNIT

#### (A) In general The term "low-income unit" means any unit in a building if—

**(i)** such unit is rent-restricted (as defined in subsection (g)(2)), and

No credit shall be allowed by reason of this section with respect to any building for the taxable year unless an extended low-income housing commitment is in effect as of the end of such taxable year.

**(B) Extended low-income housing commitment** For purposes of this paragraph, the term "extended low-income housing commitment" means any agreement between the taxpayer and the housing credit agency—

**(i)** which requires that the applicable fraction (as defined in subsection (c)(1)) for the building for each taxable year in the extended use period will not be less than the applicable fraction specified in such agreement and which prohibits the actions described in subclauses (I) and (II) of subparagraph (E)(ii),

**(ii)** which allows individuals who meet the income limitation applicable to the building under subsection (g) (whether prospective, present, or former occupants of the building) the right to enforce in any State court the requirement and prohibitions of clause (i),

**(iii)** which prohibits the disposition to any person of any portion of the building to which such agreement applies unless all of the building to which such agreement applies is disposed of to such person,

**(iv)** which prohibits the refusal to lease to a holder of a voucher or certificate of eligibility under section 8 of the United States Housing Act of 1937 because of the status of the prospective tenant as such a holder,

**(v)** which is binding on all successors of the taxpayer, and

**(vi)** which, with respect to the property, is recorded pursuant to State law as a restrictive covenant.

**(C) Allocation of credit may not exceed amount necessary to support commitment**

**(i) In general**
The housing credit dollar amount allocated to any building may not exceed the amount necessary to support the applicable fraction specified in the extended low-income housing commitment for such building, including any increase in such

# MEMORANDUM

**TO:**     **APCHA Board of Directors**

**FROM:**    **Don Taylor, Director of Finance**

**THRU:**    **Barry Crook, Assistant City Manager**
       **Mike Kosdrosky, Director of APCHA**

**DATE OF MEMO:**  **July 29, 2016**

**MEETING DATE:**  **August 3, 2016**

**RE:**      **Assignment of Partnership Interest in Aspen Country Inn I,**
       **LP**

---

**REQUEST OF BOARD:**  This is a request for the APCHA board to consider and approve the sale of the ACI asset from the existing partnership to a new partnership entity, ACI Affordable 1 LLLP.  This new partnership, concurrent with the transfer of the asset, will consist of the City as the Managing General Partner, APCHA as a Special Limited Partner and a Limited Partner, the Tax Credit Investor.  Although the City will have control, both the City and APCHA will have minor ownership interests as the Limited Partner will own 99.99% of the new partnership for tax purposes.  The sale and transfer of the asset is scheduled to occur in Sept, as is the commencement of the renovations.

This is for the APCHA Board to consider the sale of the ACI asset from the existing partnership to a new partnership entity, ACI Affordable 1 LLLP.  THE City will have an initial 49% interest in the new partnership and APCHA will have a 1% interest.  The purpose of this relates to the refinancing of the Aspen Country Inn mortgage note, the infusion of capital by the City and the issuance of tax credits for the purpose of refurbishing of the project.  This is the first of two steps to complete this financing, the second step scheduled to take place in September of this year.  At that time a 99% interest will be transferred to a Boston Capital entity.  The city and APCHA would retain a small interest and the City will be the managing General Partner.

**PREVIOUS BOARD ACTION:**   The City deeded the old motel and land to the original Partnership in 1999 and took back a promissory note and deed of trust as part of the overall financing plan for this project.  Boston Capital was a limited partner in the partnership and received federal income tax credits for the capital that they put into the partnership.  A second

2

building containing 20 additional units was added to the property. In December 2014, APCHA bought out Boston capital and assigned a 1% interest to the City.

**BACKGROUND:** Aspen Country Inn is a 40 unit, senior preference affordable housing property located adjacent to the Maroon Creek golf course. APCHA entered into a Partnership Agreement as part of a financing arrangement to build the Aspen Country Inn housing project back in 1999. Tax credits were issued that helped finance the project. The City was an active partner in making this happen and provided the land and took back a note and deed of trust. The value of the tax credits has all been realized by Boston Capital in the 15-year amortization period under IRS regulation and APCHA exercised its option to purchase the property as provided for in the partnership agreement.

**DISCUSSION:** When the Aspen Country Inn Limited partnership was set up, 99% of the interest in that entity was assigned to private equity partners, Boston Capital Corporate Tax Credit Fund XII and BCCC, Inc. This was in exchange for equity invested into the project for which they received tax credits. They were required to maintain an interest in the property for 15 years which was satisfied this year.

The City started out on a plan to refinance the mortgage on this project but then expanded the scope of the project to re-syndicate and receive tax credit proceeds again for the purpose of refurbishing the property. Based on current valuations of the project work, the partnership will receive tax credit proceeds in the approximate amount of $5.6 million. There are, however substantial costs associated with putting the tax credit deal together. The costs of the credit financing are high relative to the amount received as this project is about as small as you can possible go in this type of financing structure. When Truscott II is considered for re-syndication next year it will pencil out better as it is nearly twice the size.

The City will take the GP position in the acquiring partnership and will provide a subordinate purchase money mortgage/second note in an amount equal to its current second mortgage on the property. The city will also buy the CHFA issued tax exempt bonds up to $7.5 million in order to finance the construction costs and act as the construction lender for the project. CHFA will place the permanent financing after the construction is complete. We are requesting that APCHA maintain a small interest in the new acquiring partnership so that the property will be eligible for exemption from property taxes as provided for under Colorado Statute.

There are serious roof issues, siding replacement, heating system upgrades, need for appliance replacement and many other issues that need to be addressed for the long term viability of this valuable affordable housing component of the Aspen. The project is expected to begin this fall.

**FINANCIAL/BUDGET IMPACTS:** The financial impact to the City would be an approximate net $925,000 investment. The City will also need to provide construction financing in the amount of $2,582,197 most of which will be paid back as developer fee at the closing of the permanent financing leaving the net $925,000 investment. There is no financial impact to APCHA

**RECOMMENDED ACTION:**  Staff recommends approval of this Resolution

**PROPOSED MOTION:**  Move to approve Resolution _____ approval of Agreement of Limited Partnership and Purchase and Sale Agreement

**ATTACHMENTS:**

ACI Affordable 1 LLLP; Agreement of Limited Partnership
Purchase and Sale agreement.

## ACI AFFORDABLE 1 LLLP

## AGREEMENT OF LIMITED PARTNERSHIP

THIS AGREEMENT OF LIMITED PARTNERSHIP is entered into effective the 30th day of June, 2016, by and between City of Aspen, Colorado, a municipal corporation of the State of Colorado (the "General Partner"), and Aspen Pitkin County Housing Authority, a Colorado body corporate and politic (the "Limited Partner"). The Limited Partner and the General Partner are sometimes referred to individually as a "Partner" and collectively they are sometimes referred to as the "Partners." In consideration of the mutual promises set forth below, the parties agree as follows:

### ARTICLE 1
### FORMATION OF THE LIMITED PARTNERSHIP

1.1     Formation.  The General Partners have caused a Certificate of Limited Partnership and a Statement of Registration for ACI Affordable 1 LLLP (the "Partnership") to be filed with the Colorado Secretary of State.  Subject to section 1.5, the parties hereby agree to operate the Partnership under the name ACI Affordable 1 LLLP upon the terms and conditions provided in this Agreement, subject to the provisions of the Colorado Uniform Limited Partnership Act of 1981, as amended (the "Act").  If there is a conflict between the provisions of this Agreement and the Act, the provisions of this Agreement shall control except that if the conflict is with respect to a provision that would cause the Partnership to be taxed as an association for federal income tax purposes, then the provisions of the Act shall control.  The parties intend that the Partnership shall be taxed as a partnership.

1.2     Compliance With Laws.  The General Partner, acting directly or through an attorney-in-fact shall execute such documents (including amendments to the Combined Certificate and Statement of Registration described above) and take such further action as shall be appropriate or helpful to comply with the requirements of law for the formation and operation of a limited liability limited partnership in Colorado, the counties therein, and all other states and counties where the Partnership elects to carry on its business.  The General Partner shall not be required to deliver to the Limited Partner copies of the Partnership's Certificate of Limited Partnership and Statement of Registration or any amendments thereto.

1.3     Business.  The business of the Partnership shall be:  (a) to acquire, develop, construct, own, operate, manage and maintain an affordable housing development located in Aspen, Colorado, to be known as Aspen Country Inn (the "Project") in order to provide safe, decent and affordable housing for low-income persons and families; (b) to obtain financing and refinancing to accomplish the foregoing purposes; and (c) to do any and all other things necessary, desirable or incidental to the foregoing purposes.  The Partnership may sell or otherwise dispose of all or substantially all of its assets as provided in this Agreement, and any such sale or disposition shall be considered to be within the scope of the Partnership's business.



1

1.4     Principal Office; Agent.  (a) The principal office of the Partnership shall be at 130 Galena Street, Aspen, Colorado 81611, or such other place in Colorado as the General Partner may select from time to time.

(b)     The Partnership's agent for service of process, and its address, shall be City of Aspen, Colorado, 130 Galena Street, Aspen, Colorado 81611, or such other person or address as the General Partner may select from time to time.

1.5     Term.  The Partnership shall commence on the date that the certificate of limited partnership is filed in the office of the Secretary of State of the State of Colorado and shall continue until terminated as provided in Article 11.

ARTICLE II
DEFINITIONS

2.1     Affiliate.  An "Affiliate" of a Partner is a person or entity that controls, is controlled by or is under common control with such Partner.  A person or entity that has a 20 percent or more interest, directly or indirectly, in another person or entity shall be conclusively deemed to be a controlling person.

2.2     Code.  The Internal Revenue Code of 1986, as amended from time to time.  Any reference herein to a specific section or sections of the Code shall be deemed to include a reference to any corresponding provision of future law.

2.3     Sharing Ratio.  The "Sharing Ratio" of each Partner shall mean the percentage interest as follows:  Limited Partner – 90.01 percent; General Partner – 9.99 percent.  The Sharing Ratios of the Partners shall be adjusted from time to time as provided in section 10.1.

2.4     Treasury Regulations.  Regulations issued by the Department of Treasury under the Code.  Any reference herein to a specific section or sections of the Treasury Regulations shall be deemed to include a reference to any corresponding provision of future regulations under the Code.

ARTICLE III
CAPITAL CONTRIBUTIONS

3.1     Initial Capital Contributions.  Upon execution of this Agreement, the General Partner and the Limited Partner shall each contribute $100.00 to the capital of the Partnership.

3.2     Additional Capital Contributions.  Additional contributions to the Partnership shall be made only upon the consent of all Partners.

3.3     Interest on Capital Contributions.  No Partner shall be entitled to interest on its capital contributions.

2

3.4     Right to Enforce.  No person other than a Partner shall have the right to enforce any obligation of a Partner to contribute capital or lend funds hereunder and specifically no lender or other third party shall have any such rights.

## ARTICLE IV
## ACQUISITION AND FINANCING OF THE PROJECT

4.1     Acquisition of the Project.  The General Partner is authorized to execute any and all agreements, assignments or other documents or instruments considered necessary or desirable in connection with the acquisition of the property for the Project.

4.2     Financing.  The Partnership is authorized to obtain such financing as the General Partner considers appropriate on behalf of the Partnership in connection with the acquisition, rehabilitation and operation of the Project, including without limitation construction loans, permanent financing, and bridge financing.  In connection with any and all financing transactions, the General Partner is authorized to execute and deliver any and all loan agreements, deeds of trust, financing statements, pledges or other documents and instruments necessary or desirable in connection with such financing.

## ARTICLE V
## DISTRIBUTIONS

5.1     Distributable Cash.  The General Partner shall from time to time determine the amount of cash available for distribution to the Partners, taking into account the need for reserves to cover operating deficits, capital improvements and anticipated liabilities.

5.2     Cash Distributions.  All cash available for distribution to the Partners shall be allocated in accordance with Sharing Ratios.

## ARTICLE VI
## ALLOCATION OF PROFIT AND LOSS

6.1     Determination of Profit and Loss.  This Article provides for the allocation among the Partners of the profits and losses of the Partnership for purposes of crediting and debiting the capital accounts of the Partners.  All items of profit or loss shall be determined on an annual basis, and for such other periods as may be determined appropriate by the General Partner.

6.2     Allocation of Profit and Loss.  All items of profit and loss shall be allocated in accordance with Sharing Ratios.

## ARTICLE VII
## ALLOCATION OF TAXABLE INCOME AND TAX LOSSES

7.1     In General.  (a) Except as provided in sections 7.1(b) and 7.2, each item of income, gain, loss and deduction of the Partnership for federal income tax purposes shall be allocated among the Partners in the same manner as such item is allocated for book purposes under Article VI.

(b)     To the extent of any recapture income (as defined below) resulting from the sale or other taxable disposition of a Partnership asset, the amount of any gain from such disposition allocated to (or recognized by) a Partner for federal income tax purposes pursuant to sections 7.1(a) or 7.2 shall be deemed to consist of recapture income to the extent such Partner has been allocated or has claimed any deduction directly or indirectly giving rise to the treatment of such gain as recapture income. For this purpose "recapture income" shall mean any gain recognized by the Partnership (but computed without regard to any adjustment required by sections 734 and 743 of the Code) upon the disposition of any property or asset of the Partnership that does not constitute capital gain for federal income tax purposes because such gain represents the recapture of deductions previously taken with respect to such property or assets.

7.2     Allocation of Section 704(c) Items. The Partners recognize that with respect to property contributed to the Partnership by a partner and with respect to property revalued in accordance with Treasury Regulation § 1.704-1(b)(2)(iv)(f) (referred to as "Adjusted Properties"), there will be a difference between the agreed values or Carrying Values, as the case may be, of such property at the time of contribution or revaluation, as the case may be, and the adjusted tax basis of such property at that time. All items of tax depreciation, cost recovery, amortization and gain or loss with respect to such contributed properties and Adjusted Properties shall be allocated among the Partners to take into account the book-tax disparities with respect to such properties in accordance with the provisions of sections 704(b) and 704(c) of the Code and the Treasury Regulations under those sections. Any gain or loss attributable to a contributed property or an Adjusted Property (exclusive of gain or loss allocated to eliminate such book-tax disparities) shall be allocated in the same manner as such gain or loss would be allocated for book purposes under Article VI.

7.3     Integration With Section 754 Election. All items of income, gain, loss, deduction, credit and basis allocations recognized by the Partnership for federal income tax purposes and allocated to the partners in accordance with the provisions hereof shall be determined without regard to any election under section 754 of the Code that may be made by the Partnership; provided, however, such allocations, once made, shall be adjusted as necessary or appropriate to take into account the adjustments permitted by sections 734 and 743 of the Code.

7.4     Allocation of Tax Credits. All low income housing tax credits with respect to any building owned by the Partnership shall be allocated in the same fashion as the depreciation deductions with respect to the building are allocated. All other tax credits, including the investment tax credit, with respect to the Partnership's property or operations shall be allocated in the manner required by the Code or the Regulations to obtain the maximum aggregate benefit from the credit, or otherwise in the same manner as the expenditures or other deductions giving rise to the credit are allocated under this Agreement.

## ARTICLE VIII
## MANAGEMENT POWERS

8.1     Limited Liability. The liability of the Limited Partner shall be limited as set forth in the Act. Except as permitted by Colorado law and section 8.3, the Limited Partner shall take

no part in the control, management, direction or operation of the affairs of the Partnership and shall have no power to bind the Partnership. The General Partner may from time to time seek suggestions and expressions of opinion from the Limited Partner on major policy decisions, but need not act on such advice, and at all times the sole control and management of the Partnership shall rest with the General Partner, subject to the provisions of this Article VIII.

8.2   Management Authority. (a) Except as otherwise provided in this Article VIII, the General Partner is hereby expressly authorized on behalf of the Partnership to make all decisions with respect to the Partnership's business and to take all actions to carry out such decisions. Without limiting the generality of the foregoing, the General Partner is authorized to make all decisions and to take all actions with respect to the operation, management, and maintenance of all or any part of the Project and the disposition of property in the ordinary course of business, subject to any required consent under section 8.3.

(b)     After execution of this Agreement, all documents executed on behalf of the Partnership must be signed by the General Partner, including (i) all deeds, assignments, leases, subleases, management and maintenance contracts; (ii) all checks, drafts and other orders for the payment of Partnership funds; (iii) all promissory notes, mortgages, deeds of trust, security agreements, financing statements and other similar documents; and (iv) all other instruments of any kind or nature relating to the affairs of the Partnership whether like or unlike the foregoing.

(c)     The General Partner may cause the Partnership to enter into any transactions or agreements with Partners (including the General Partner) or its Affiliates (in addition to the agreements described in section 8.4) for goods and services without the prior approval of all Partners.

8.3   Approval of Other Partners. Without the prior written approval of the Limited Partner, the General Partner shall not cause the Partnership to acquire any assets or conduct any activity other than as described in Section 1.3.

8.4   Management, Development and License Agreements. The General Partner is authorized on behalf of the Partnership to enter into such management agreements, development agreements, franchise agreements and other agreements appropriate or helpful to carry out the business of the Partnership, including without limitation, agreements with Affiliates of the Partnership.

8.5   Time Devoted to Business. The General Partner shall devote such time to the business of the Partnership as is reasonably necessary for the efficient carrying on of the Partnership's business.

8.6   Information Relating to Partnership. Upon request, the General Partner shall supply to any Partner any information reasonably requested regarding the Partnership or its activities, provided that obtaining the information is not unduly burdensome to the General Partner. During ordinary business hours, and at the reasonable convenience of the General Partner, any Partner or its authorized representative shall have access to all books, records and

materials regarding the Partnership and its activities, and the General Partner shall make all reasonable attempts to provide access to books, records and materials not otherwise in the General Partner's possession.

8.7   Exculpation. In carrying out their duties hereunder the Partners shall not be liable to the Partnership nor to any Partner for their good faith actions, or failure to act, nor for any errors of judgment, nor for any act or omission believed in good faith to be within the scope of authority conferred by this Agreement, but only for willful misconduct or gross negligence in the performance of their obligations under this Agreement. The Partnership shall indemnify and hold harmless each of the Partners and their officers, directors, partners, agents, employees and Affiliates as to third parties against and from any personal loss, liability or damage incurred as a result of any act or omission of any Partner believed in good faith to be within the scope of authority conferred by this Agreement, except for willful misconduct or gross negligence, but not in excess of the value of the assets of the Partnership as of the date the General Partner learns of such act or omission resulting in the personal loss, liability or damage to a third party (the "Date of Notice"). In all cases, indemnification shall be provided only out of and to the extent of the assets of the Partnership as of the Date of Notice, and no individual Partner shall have any personal liability whatsoever on account thereof. In no event shall the Partnership be liable to a third party under this section 8.7 for the amount of any additional contributions made to the Partnership after the Date of Notice or for the amount of any increase in value of any Partnership assets after the Date of Notice. Notwithstanding the foregoing, the Partnership's indemnification of the Partners and their officers, directors, agents and employees as to a third party shall be only with respect to such loss, liability or damage that is not otherwise compensated for by insurance carried for the benefit of the Partnership.

8.8   Insurance. The General Partner shall maintain in force at all times for the protection of the Partnership and all Partners to the extent of their insurable interests such insurance as it believes is warranted for the operations being conducted.

8.9   Other Activities. Each Partner shall at all times be free to engage and possess an interest in any business or venture for its own account, including without limitation the formation of partnerships, joint ventures and corporations, which business or venture may directly or indirectly compete with the business of the Partnership.

8.10   Reliance by Third Parties. No third party dealing with the Partnership shall be required to ascertain whether the General Partner is acting in accordance with the provisions of this Agreement. Such third parties may rely on documents executed by the General Partner as binding the Partnership. The foregoing provisions of this section 8.10 shall not apply to third parties who are Affiliates of a Partner.

8.11   Tax Matters Partner. Pursuant to section 6231(a) of the Code, the General Partner is hereby designated as the tax matters partner for the Partnership. The General Partner is expressly authorized to perform, on behalf of the Partnership or any Partner, any act that may be necessary to make this designation effective under any regulation, ruling, procedure or instruction that may be issued by the Internal Revenue Service.

8.12   <u>Duties of General Partner</u>.  (a) The General Partner shall carry out its duties as General Partner hereunder in a diligent and workmanlike manner, in accordance with sound business practices and consistent with the fiduciary duties partners owe to each other, and shall use its best efforts to employ and engage qualified personnel in furthering the purposes of the Partnership.

(b)   The General Partner may delegate any or all of its duties under this section 8.12.

8.13   <u>Fees and Reimbursements</u>.  (a) No Partner shall be entitled to any management fee or salary for managing the operations of the Partnership.

(b)   The General Partner shall be reimbursed by the Partnership for all reasonable out-of-pocket costs incurred by it in the organization and management of the Partnership, including fees and costs for legal, accounting and administrative services.

## ARTICLE IX
## ACCOUNTING AND REPORTING

9.1   <u>Books</u>.  The General Partner shall maintain complete and accurate books of account of the Partnership's affairs at the principal office of the Partnership.  The Partnership's books shall be kept on the accrual basis of accounting.  The Partnership's accounting period shall be the calendar year ending December 31.

9.2   <u>Capital Accounts</u>.  (a) The General Partner shall maintain a separate capital account for each Partner and such other Partner accounts as may be necessary or desirable to comply with the requirements of applicable laws and regulations, including the Treasury Regulation issued under Section 704 of the Code.

9.3   <u>Transfers During Year</u>.  In order to avoid an interim closing of the Partnership's books, the share of profits and losses under Article VI of a Partner who transfers part or all of its interest in the Partnership during the Partnership's accounting year may be determined by taking its pro rata share of the amount of such profits and losses for the year and the balance of the profits and losses attributable to the Partnership interest transferred shall be allocated to the transferee of such interest.  The proration shall be made by the General Partner after consultation with the accountants for the Partnership and may be based on the portion of the Partnership's accounting year which has elapsed prior to the transfer or may be determined under any other reasonable method; provided, however, that any income or loss arising from the sale of property other than in the ordinary course of business shall be allocated to the owner of the Partnership interest at the time such income or loss was realized.

9.4   <u>Reports</u>.  The General Partner shall deliver to each Partner annual statements on the Partnership's operations at the end of each fiscal year.  The books of account shall be closed promptly after the end of each fiscal year.  As soon as practicable thereafter, the General Partner shall make a written report to each Partner which shall include a statement of receipts, expenditures, profits and losses, and such additional statements with respect to the status of the Partnership's assets and the distribution of Partnership funds as are necessary to advise all

Partners properly about their investment in the Partnership.  Prior to March 1st of each year each Partner shall also be provided with sufficient information as is necessary to allow it to file its own income tax return for the preceding year.

     9.5    Section 754 Election.  If requested by a Partner the Partnership shall make the election provided for under section 754 of the Code.  Any costs attributable to making such election shall be borne solely by the requesting Partner.

ARTICLE X
TRANSFER OF PARTNER'S INTEREST

     10.1    General Partner.  Notwithstanding anything to the contrary contained herein, without the prior written approval of all of the Partners, no additional general or limited partner shall be admitted to the Partnership and the General Partner shall not substitute a successor General Partner in its stead.

ARTICLE XI
TERM; WITHDRAWAL, DISSOLUTION OR
BANKRUPTCY OF A PARTNER

     11.1    Events of Dissolution.  (a) The Partnership shall continue until December 31, 2035, unless sooner dissolved by (i) determination of the General Partner to dissolve the Partnership, or (ii) by the withdrawal, dissolution, bankruptcy or termination of a General Partner (unless the Partnership is continued under section 11.1(b) below) or (iii) any other event causing dissolution of a limited partnership under the Act.  For purposes of this Agreement:  a Partner shall be considered bankrupt if an order for relief under Chapter 7 of the Bankruptcy Reform Act of 1978 has been entered against him; and a General Partner that is a partnership shall be considered dissolved only if the General Partner commences winding up and termination of its business after an event of dissolution.

     (b)    Upon the withdrawal, dissolution, bankruptcy, or termination of the General Partner, the Partnership shall be dissolved unless within 90 days after the occurrence of such event all of the remaining Partners agree in writing to continue the business of the Partnership and to the appointment of one or more additional General Partners if necessary or desired, under an agreement containing the terms and conditions set forth in this Agreement, with such amendments as may then be adopted.

     11.2    Limited Partners.  Except as expressly provided otherwise in this Agreement, a Limited Partner shall have no power to withdraw from or terminate his membership in the Partnership, and the Limited Partners shall have no power to dissolve the Partnership.  Upon withdrawal pursuant to the provisions of this Agreement, a Limited Partner shall have no right to receive any value for his interest in the Partnership except as expressly provided in this Agreement.

     11.3    Withdrawal of General Partner.  Notwithstanding the provisions of section 11.1 with respect to the withdrawal, dissolution or bankruptcy of a General Partner, the General Partner covenants and agrees that it will not withdraw from the Partnership or take any voluntary

8

(i) <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Colorado.

(j) <u>Severability</u>. If any term or provision of this Agreement is held to be invalid, unenforceable or illegal for any reason whatsoever, such provision shall be severed from this Agreement and shall not affect the validity of the remainder of this Agreement.

(k) <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, all of which shall constitute a single agreement and each of which shall be an original for all purposes.

(l) <u>Waiver</u>. Except as herein expressly provided, no waiver by a party of any breach or default under this Agreement by another party shall be deemed a waiver of any other breach or default of any kind or nature, and no acceptance of payment or performance by a party after any such breach or default by another party shall be deemed to be a waiver of any further breach or default by such other party whether or not the first party knows of such breach or default at the time it accepts such payment or performance. No failure on the part of a party to exercise any right it may have by the terms of this Agreement or by law upon the breach or default of another party, and no delay in the exercise of any such right by the first party at any time which such other party may be in breach or default, shall operate as a waiver of any breach or default, or as a modification in any respect of the provisions of this Agreement.

(m) <u>Gender</u>. Whenever the singular or plural number, masculine or feminine or neuter gender is used herein, it shall equally include the other.

(n) <u>Time Computations</u>. Unless otherwise provided herein, in computing a period of days for performance or payment: If a date for performance or payment falls on a holiday or weekend, the time for performance or payment shall be extended to the next business day, and if performance or payment has occurred on such weekend or holiday, it shall be deemed to have occurred on the next business day.

(o) <u>Further Instruments</u>. Subsequent to Closing, each party shall from time to time execute and deliver such further documents or instruments as the other party, its counsel, or the Title Company may reasonably request to effectuate the intent of this Agreement, including, without limitation, documents necessary for compliance with the laws, ordinances, rules and regulations of any applicable governmental authorities.

[The remainder of this page is intentionally left blank.]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

PURCHASER:

ACI AFFORDABLE 1 LLLP,
a Colorado limited liability limited partnership

By: City of Aspen, Colorado, General Partner

By: _____

Name: _____

Title: _____

SELLER:

ASPEN COUNTRY INN I, L.P., a Colorado
limited partnership

By:   Aspen/Pitkin County Housing Authority,
       General Partner

By: _____

Name: _____

Title: _____

10

**AGREEMENT FOR SALE AND PURCHASE**
**OF REAL ESTATE**
**(ASPEN COUNTRY INN)**

THIS AGREEMENT FOR SALE AND PURCHASE OF REAL ESTATE (this "Agreement") is entered into effective the 29th day of June, 2016, by and between ACI Affordable 1 LLLP, a Colorado limited liability limited partnership ("Purchaser") and Aspen Country Inn I, L.P., a Colorado limited partnership ("Seller").

In consideration of the mutual covenants and agreements set forth in this Agreement, and in consideration of Ten Dollars ($10.00) in hand paid by Purchaser to Seller, the receipt and sufficiency of which are hereby acknowledged by Purchaser and Seller, Purchaser and Seller agree as follows:

1.    PROPERTY

Seller shall sell to Purchaser, and Purchaser shall purchase from Seller, subject to the terms and conditions of this Agreement, the improved real property located in the City of Aspen, in Pitkin County, Colorado (referred to as the "Real Property"), and more particularly described on Exhibit A attached hereto and incorporated herein by this reference, together with the following:

(i)    all easements, licenses, rights-of-way, air rights, water, water rights, ditch, ditch rights, minerals, mineral rights, water and sewer taps, development rights, any rights of Seller to the center lines of the adjoining streets or alleys (open or closed) and other privileges, appurtenances, hereditaments and rights of Seller now or hereafter acquired belonging or inuring to the benefit of the Real Property;

(ii)    all leases and licenses for the use and occupancy of the Real Property and Improvements including equipment leases unless otherwise terminated in accordance herewith (collectively, the "Leases");

(iii)    all contracts, franchise agreements, service contracts, reservations agreements to the extent assignable unless otherwise terminated in accordance herewith (collectively, the "Contracts");

(iv)    all of Seller's right, title and interest in all licenses, deposits (including tenant deposits), reserves, permits, warranties, surveys, reports and other general intangibles, rights, documents, or property which benefit or are otherwise used in conjunction with all or any portion of the Real Property and Improvements including utility deposits (collectively, the "Licenses, Deposits and Permits"); and

(v)    all tangible personal property owned by Seller used in connection with the Real Property (the "Personal Property").

The Real Property and the items described in subparts (i) through (v) above are collectively referred to as the "Property." The Property consists of two buildings consisting of 40 units of residential housing, which Purchase intends to develop and rehabilitate as affordable housing (the "Project").

10

In addition, at the Closing, Seller shall assign and convey to Purchaser all of its right, title and interest in and to (i) all deposits, accounts, prepaid expenses and other funds held by Seller with respect to the Property; (ii) all applications, commitments, determinations and agreements relating to federal low income housing tax credits for the Project; (iii) all rights under commitments, agreements and instruments relating to financing the Project, including the commitment for construction and permanent financing; and (iv) all other contract rights, environmental assessments, reports, studies, proposals, bids, plans, drawings, specifications, licenses, permits, approvals and any other rights under all contracts, review processes or other commitments or agreements relating to the Project (collectively, the "Ancillary Rights").

Purchaser acknowledges and agrees that the Property is, and shall remain subject to, a Land Use Restriction Agreement for the benefit of Colorado Housing and Finance Authority.

2.     PURCHASE PRICE AND REIMBURSEMENT

(a)     The total purchase price (the "Purchase Price") for the Property shall be $4,550,000, of which, based upon an appraisal of the Property obtained by the Seller, $0.00 is attributable to the land included as part of the Real Property (due to the affordability restrictions currently of record) and $4,550,000 is attributable the buildings and other improvements located on the Real Property. The Purchase Price shall be payable in cash at the Closing in an amount equal to the outstanding balance on the first mortgage loan encumbering the Property, and the balance in the form of a promissory note, which shall bear interest at an annual rate that is equivalent to the lowest applicable federal rate for the month in which Closing occurs, compounded annually, which shall be secured by a second deed of trust encumbering the Property, which shall be due on December 31, 2057, shall, and which shall be payable out of distributable cash from the Project after payment of any deferred development fee owing by Purchaser with respect to the Project.

(b)     At the Closing, Purchaser shall reimburse Seller for, or shall assume and pay, all expenses and obligations incurred by Seller with respect to the Property and the Project. This section shall not limit the obligation of Purchaser to reimburse Seller for all of such expenses incurred by Seller prior to or after the Effective Date. Purchaser hereby assumes and agrees to pay all such expenses incurred by Seller and not yet paid.

3.     FINANCING CONTINGENCY

Purchaser agrees to use commercially reasonable efforts to obtain and close a construction loan on terms determined appropriate by Purchaser (the "Construction Loan") and an equity investment in consideration of low income housing tax credits (the "Equity Investment") in order to fund the development and rehabilitation of the Project. If, despite using such commercially reasonable efforts, Purchaser is unable to obtain and close on the Construction Loan and the Equity Investment, Purchaser may elect to terminate this Agreement by written notice to Seller on or prior to the Closing.

4.     REPRESENTATIONS OF SELLER

Seller makes the following representations to the Purchaser with respect to the Property:

2

(i)     Seller acquired the Real Property pursuant to a deed dated June 27, 1997, and recorded in the real property records of Pitkin County on November 14, 1997, as reception no. 410661 (the "Acquisition Deed").

(ii)     Seller constructed on the Real Property the 40-unit multi-family apartment development, consisting of two buildings now known as Aspen Country Inn. These improvements were placed in service in 1999.

(iii)     Seller has owned the Property (including the improvements) at all times since 1999, has not conveyed any interest in the Property to any other person, and currently is the sole owner of the Property.

5.     INSPECTION AND TITLE

(a)     Purchaser acknowledges and agrees that it has completed all inspections, analyses and other reviews of the Property, it deems necessary in its sole discretion, including but not limited to physical inspection of the Property and any and all information and agreements relating to the ownership, maintenance, management and operation of the Property. Purchaser acknowledges and agrees that its inspection is complete and no further examination or inspection of the Property is necessary.

(b)     Purchaser may, at its cost and expense, obtain a commitment for title insurance with respect to the Property. Purchaser shall be responsible for removing or obtaining releases of any matters identified as exceptions to title, other than releases of existing deeds of trust encumbering the Property, which shall be the responsibility of Seller. Purchaser shall be responsible for satisfying all requirements for the issuance of any policy of title insurance with respect to the Property. Purchaser may, based upon its review of the title commitment, elect to terminate this Agreement at any time prior to the Closing

6.     AS IS WHERE IS

Purchaser acknowledges that the conveyance of the Property is specifically made "AS-IS" and "WHERE-IS," without any representations or warranties, express or implied, including, without limitation, implied warranties of fitness for any particular purpose or merchantability or any other warranties whatsoever contained in or created by statute or otherwise. Purchaser acknowledges that the deed and/or in the other documents to be delivered by Seller at Closing, neither Seller nor any of its agents have made, and disclaim, any representations, warranties, promises, covenants, agreements or guaranties of any kind or character whatsoever, whether express or implied, oral or written, of, as to, concerning, or with respect to, (i) the value, nature, quality or condition of the Property, including, without limitation, the water, soil and geology, (ii) the suitability of the Property for any and all activities and uses which may be conducted thereon, (iii) the compliance of or by the Property with any laws, rules, ordinances or regulations of any applicable governmental authority, (iv) the habitability, merchantability, marketability, profitability or fitness for a particular purpose of the Property, or (v) any other matter with respect to the Property, and that neither Seller nor any of its agents have made, and disclaim any representations or warranties regarding compliance of the Property with any environmental protection, pollution or land use laws, rules, regulations, orders or requirements, including, without limitation, those pertaining to any solid waste, as defined by the

3

U.S. Environmental Protection Agency regulations at 40 C.F.R., Part 261, or the disposal or existence, in or on the Property, of any Hazardous Substances, as defined by the Comprehensive Environmental Response Compensation and Liability Act of 1980, as amended, and the regulations promulgated thereunder. Purchaser shall rely solely on its own investigation of the Property and not on any information provided or to be provided by Seller or its agents or contractors, except as expressly provided in this Contract. Seller shall not be liable or bound in any manner by any verbal or written statements, representations or information pertaining to the Property or the operation thereof, furnished by any party purporting to act on behalf of Seller.

7.   STATUTORILY REQUIRED NOTICES

SPECIAL TAXING DISTRICTS. SPECIAL TAXING DISTRICTS MAY BE SUBJECT TO GENERAL OBLIGATION INDEBTEDNESS THAT IS PAID BY REVENUES PRODUCED FROM ANNUAL TAX LEVIES ON THE TAXABLE PROPERTY WITHIN SUCH DISTRICTS. PROPERTY OWNERS IN SUCH DISTRICTS MAY BE PLACED AT RISK FOR INCREASED MILL LEVIES AND EXCESSIVE TAX BURDENS TO SUPPORT THE SERVICING OF SUCH DEBT WHERE CIRCUMSTANCES ARISE RESULTING IN THE INABILITY OF SUCH A DISTRICT TO DISCHARGE SUCH INDEBTEDNESS WITHOUT SUCH AN INCREASE IN MILL LEVIES. PURCHASER SHOULD INVESTIGATE THE DEBT FINANCING REQUIREMENTS OF THE AUTHORIZED GENERAL OBLIGATION INDEBTEDNESS OF SUCH DISTRICTS, EXISTING MILL LEVIES OF SUCH DISTRICT SERVICING SUCH INDEBTEDNESS, AND THE POTENTIAL FOR AN INCREASE IN SUCH MILL LEVIES.

The parties acknowledge that Seller is required to disclose whether Seller knows that the Property was previously used as a methamphetamine laboratory. No disclosure is required if the Property was remediated in accordance with state standards and other requirements are fulfilled pursuant to § 25-18.5-102, C.R.S. Purchaser further acknowledges that Purchaser has the right to engage a certified hygienist or industrial hygienist to test whether the Property has ever been used as a methamphetamine laboratory. In the event that the Property has been used as a methamphetamine laboratory, Purchaser may deliver written notice to Seller, on or before Closing, to terminate this Contract.

8.   OPERATION OF PROPERTY PRIOR TO CLOSING

Seller agrees: (i) to continue its care, maintenance and operation of the Property on at least the same standards as employed by Seller to date; (ii) not to make, terminate or materially change, amend, modify or waive any leases or other agreements affecting the Property, except in the ordinary course of business; (iii) not to violate any laws, rules, regulations or ordinances affecting the ownership, management or use of the Property; (iv) not to commit any waste; and (iv) not to make any substantial alterations or changes to the Property other than ordinary and necessary maintenance and repairs without Purchaser's prior written approval.  Purchaser agrees not to unreasonably withhold or delay any such approval. Nothing contained herein shall prevent Seller from acting to prevent loss of life, personal injury or property damage in emergency situations, or prevent Seller from performing any act with respect to the Property that may be required by applicable law, rules or governmental regulation. Seller shall promptly notify Purchaser of any action taken in conjunction with such emergency or regulation.  Seller agrees to promptly notify Purchaser of any material

4

adverse change in the Property and Purchaser agrees that if Seller cannot remedy such material adverse change prior to the Closing that Purchaser shall extend the Closing for a period of fifteen (15) days to permit Seller time to complete such cure.

9.   CLOSING

(a)   The purchase and sale transaction contemplated by this Agreement shall close simultaneous with the closing of the Construction Loan (the "Closing" or the "Closing Date"); provided, that if the Closing has not occurred by November 30, 2016, the Seller may elect to terminate this Agreement. Purchaser, at its option exercised in writing and delivered to Seller, may elect to close earlier. The procedure to be followed by the parties in connection with the Closing shall be as follows:

(i)   All documents to be delivered and recorded and funds to be provided hereunder shall be delivered to the Title Company in escrow.

(ii)   Seller shall execute, deliver or cause to be delivered, as applicable:

(A)   Special Warranty Deed conveying the Property to Purchaser, duly executed and acknowledged by Seller, in proper form generally in use in Colorado;

(B)   An instrument assigning the Leases, Contracts, Licenses, Deposits, and Permits, and Ancillary Rights to Purchaser, whereby Purchaser assumes such items (the "Assignment");

(C)   An instrument conveying the Personal Property from Seller to Purchaser;

(D)   Evidence of Seller's authority to convey the Property and execute the documents in form and substance reasonably acceptable to Purchaser;

(E)   An affidavit complying with the requirements of the Foreign Investment in Real Property Tax Act and Colorado real estate withholding laws;

(F)   Possession of all original documents, including Contracts, Leases, Licenses, Deposits and Permits and General Intangibles; and

(G)   All other documents required to be executed by Seller pursuant to the terms of this Agreement or under the terms of any applicable law.

(iii)   Purchaser shall deliver or cause to be delivered:

(A)   The Purchase Price to be paid as provided in Paragraph 2(a) above;

(B)   Payment or other provision for the reimbursement of the expenses described in Paragraph 2(b) above;

(C)   A counterpart of the Assignment executed by Purchaser; and

5

(D)     All other documents required to be executed by Purchaser pursuant to the terms of this Agreement.

(iv)     Purchaser and Seller shall each deliver to the other two executed copies of the Purchaser's and Seller's statement of settlement setting forth all prorations, disbursements of the Purchase Price, and expenses of the Closing.

(v)     Purchaser shall pay all closing or escrow charges of the Title Company.

(b)     Purchaser shall pay for an ALTA Owner's Policy and endorsements as desired by Purchaser.

(c)     Purchaser shall pay all transfer fees, sales taxes, stamp taxes or other fees and costs which arise from the sale of the Property.

10.     PRORATIONS

(a)     The following prorations shall be made between Seller and Purchaser at Closing:

(i)     Real and personal property taxes and assessments on the Property, if any, for the year of Closing. If, as of the Closing, the actual tax bills for the year in question are not available and the amount of taxes or assessments to be prorated cannot be ascertained, then the most recent known rates, millages and assessed valuations (which amounts shall relate to the same tax year) shall be used; however, such proration shall not be deemed final and shall be adjusted as soon as the final tax and assessment liability shall be known. To the extent that the final tax and assessment liability discloses that proration at Closing was inaccurate, then the party owing any shortage to the other shall promptly pay same to the other within fifteen (15) days of receipt of written notice from the other;

(ii)     Rents (including prepaid rents, rents paid for the month in which Closing occurs and unpaid rents) shall be pro-rated as of the date of Closing with an adjustment post-closing between the parties;

(iii)     Amounts due for utilities, service contracts, equipment leases, and other costs and expenses (exclusive of management fees) relating to the ownership, maintenance and operation of the Property shall be prorated through the date of Closing; and

(iv)     To the extent of any tenant deposits ("Deposits"), the amount of the Deposits shall, at Seller's option, be either transferred to Purchaser as of the date of Closing or offset against the Purchase Price.

(b)     Other closing costs shall be apportioned between the parties in accordance with the normal and customary practice of commercial real estate transactions in Pitkin County, Colorado. Purchaser and Seller each agree to reasonably cooperate with each other with respect to the transition of ownership. If the prorations paid or credited at Closing were inaccurate, then the party owing any difference to the other shall pay the same within fifteen (15) days of receipt of notice of the amount

6

due together with copies of all applicable invoices and back-up materials. This obligation shall survive Closing and shall not be merged with the deed.

11.  DAMAGE TO PROPERTY

If the Property is damaged by fire, flood or other casualty between the date of this Agreement and the date of Closing, Seller shall promptly notify Purchaser and within five (5) days of receipt of such notice, Purchaser may elect to either (i) terminate this Agreement upon written notice to Seller, in which case this Agreement shall be of no further force or effect, or (ii) continue this Agreement in full force and effect, in which event all insurance proceeds arising out of such casualty shall be assigned and paid to Purchaser together with any deductible or co-insurance payment under such policy.

12.  REMEDIES

If any obligation hereunder is not performed as herein provided, there shall be the following remedies:

(a)  If Purchaser is in Default. All payments and things of value received hereunder shall be forfeited by Purchaser and retained on behalf of Seller and both parties shall thereafter be released from all obligations hereunder. It is agreed that such payments and things of value are Liquidated Damages and are Seller's sole and only remedy for Purchaser's failure to perform the obligations of this Agreement. Seller expressly waives the remedies of specific performance and additional damages.

(b)  If Seller is in Default. Purchaser may elect to treat this Agreement as cancelled, in which case all payments and things of value received hereunder shall be returned and Purchaser may recover such damages as may be proper, or Purchaser may elect to treat this Agreement as being in full force and effect and Purchaser shall have the right to specific performance or damages, or both (including the right of offset).

(c)  Right to Cure. Neither party shall be deemed in default hereunder unless notice of default is given to such party and the party fails to cure the default within five (5) days of receipt of such notice.

13.  MISCELLANEOUS

(a)  Real Estate Broker's Commission. Purchaser and Seller represent and warrant to one another that no broker, person or entity is entitled to a commission, finder's fee or other compensation arising from this transaction, and each party hereto agrees to indemnify, defend and hold the other party harmless from and against any and all claims, loss or damage relating to or arising out of any claim for compensation by any other broker, person or entity claiming by or through such indemnifying party.

7

(b)    Indemnity.

(i)    Seller agrees to hold Purchaser, its successors, assigns, affiliates, directors, officers, employees and partners, or any of them, harmless from and against any and all liabilities, claims, damages, mechanic's liens and penalties and any loss, cost, or expense incurred by Purchaser incident to, resulting from, or in any way arising out of, any claim in connection with the ownership or operation of the Property to the extent that such claim (1) arises from any failure by Seller to perform its obligations hereunder or (2) arises from Seller's operation of the Property prior to the Closing.

(ii)    Purchaser agrees to hold Seller, its successors, assigns, affiliates, directors, officers, employees and partners, or any of them, harmless from and against any and all liabilities, claims, damages, mechanic's liens and penalties and any loss, cost, or expense incurred by Seller incident to, resulting from, or in any way arising out of, any claim in connection with the ownership or operation of the Property to the extent that such claim (1) arises from any failure by Purchaser to perform its obligations hereunder or (2) arises from Purchaser's operation of the Property subsequent to the Closing.

(c)    Survival. All warranties, representations, covenants and agreements contained in this Agreement shall survive termination of this Agreement and the execution and delivery of this Agreement and any and all documents delivered in connection with this Agreement and shall survive the closing of the transactions contemplated by this Agreement and any and all performances in accordance with this Agreement.

(d)    Notices. Any notice, request, demand or other communication required or permitted under this Agreement shall be in writing and shall be effective upon personal delivery of same, facsimile transmission, or one (1) business day after deposit with a responsible overnight courier service (such as Federal Express, DHL or Airborne), or three (3) business days after deposit of same in the United States mail, postage prepaid, registered or certified mail, return receipt requested, sent to the intended addressees at their respective addresses set forth on the signature page of this Agreement. Any party may change its address by notice to the other parties delivered in accordance with the terms of this Agreement.

(e)    Headings. The headings used in this Agreement are for purposes of convenience only and shall not be used in interpreting this Agreement.

(f)    Entire Agreement. This document represents the entire agreement between the parties with respect to the subject matter hereof. Amendments and modifications to this Agreement must be in writing and signed by both the Seller and the Purchaser.

(g)    Attorneys' Fees. In the event of any controversy, claim or action in connection with or arising out of this Agreement, the prevailing party shall be entitled, in addition to all expenses, costs or damages, to reasonable attorneys' fees and legal costs.

(h)    Time of the Essence. Time is of the essence with respect to this Agreement.

action in bankruptcy or any voluntary action to dissolve itself prior to the sixteenth anniversary date of the commencement of the Partnership. If the General Partner violates this covenant and agreement, the wrongful withdrawal, bankruptcy or dissolution shall be effective for purposes of this Article XI, but such Partner shall be liable for damages to the other Partners and to the Partnership for such wrongful withdrawal, bankruptcy or dissolution.

11.4    Waiver of Appraisal, Valuation Rights and Partition. In the event of the withdrawal, dissolution or bankruptcy of any Partner, the rights of the Partner or its successors and assigns under applicable Colorado law with respect to the inventory of assets, appraisals, accounting or sale of assets shall not apply and are hereby expressly waived by all Partners. Each Partner expressly agrees that the provisions contained in this Agreement shall bind and control its successors and assigns, including without limitation, the provisions applicable in the event of the withdrawal, dissolution or bankruptcy of a Partner. Each of the Partners hereby waives any and all rights, duties, obligations and benefits with respect to any action for partition of the Partnership property, or to compel any sale thereof.

ARTICLE XII
DISSOLUTION AND TERMINATION

12.1    Final Accounting. In case of the dissolution of the Partnership, a proper accounting shall be made as provided in section 9.4 from the date of the last previous accounting to the date of dissolution.

12.2    Liquidation. (a) Upon the dissolution of the Partnership, the General Partner, or, in the case of its dissolution, insolvency, bankruptcy or withdrawal, the other General Partner or (if none) some person selected by the Partners whose Sharing Ratios total 51 percent or more of the total Sharing Ratios of all the remaining Partners, shall act as liquidator to wind up the Partnership. Subject to the required consent of other Partners under section 8.3, the liquidator shall have full power and authority to sell, assign and encumber any or all of the Partnership's assets and to wind up and liquidate the affairs of the Partnership in an orderly and businesslike manner. All proceeds from liquidation shall be distributed in the following order of priority: (i) to the payment of debts and liabilities of the Partnership and the expenses of liquidation, including any advances to the Partnership by any Partner to the extent such advances have not been reimbursed previously; (ii) to the setting up of such reserves as the liquidator may reasonably deem necessary for any contingent liabilities of the Partnership; and (iii) to the Partners in accordance with Article V.

(b)    In the event that any Partner's capital account balance is a negative amount after all allocations to such account in accordance with Article VI and distribution in accordance with section 12.2(a), such Partner shall have no obligation to contribute any amount to the Partnership as a result of such negative capital account.

12.3    Distribution in Kind. If a portion of the Partnership's assets is to be distributed in kind to the Partners, the liquidator, with the approval of the Partners possessing a majority-in-interest of the Sharing Ratios, shall obtain an independent appraisal of the fair market value of each such asset at a date reasonably close to the date of liquidation. Any unrealized appreciation

9

or depreciation with respect to such assets shall be allocated among the Partners in accordance with the provisions of Article VI as if the assets had been sold for the appraised value and taken into consideration in determining the balance in the Partners' capital accounts as of the date of liquidation. Distribution of assets in kind shall be made to the Partners in the order of priority set forth in section 12.2 as if the assets had been sold for the appraised value. Distribution of any asset in kind to a Partner shall be considered a distribution of an amount equal to the asset's fair market value for purposes of section 12.2. Except as otherwise determined by the liquidator pursuant to this section 12.3, no Partner shall have any right to receive distributions of property, other than cash, from the Partnership.

12.4    Waiver of Right to Court Decree of Dissolution. The Partners agree that irreparable damage would be done to the Partnership if any Partner brought an action in court to dissolve the Partnership. Accordingly, each of the Partners accepts the provisions of this Agreement as its sole entitlement on termination of his membership in the Partnership. Each Partner hereby waives and renounces its right to seek a court decree of dissolution or to seek the appointment by a court of a liquidator for the Partnership.

12.5    Cancellation of Certificate. Upon the completion of the distribution of Partnership assets as provided in this Article XII, the Partnership shall be terminated, and the person acting as liquidator (or the General Partner if necessary) shall cause the cancellation of the Partnership's certificate of limited partnership and shall take such other actions as may be necessary to terminate the Partnership.

## ARTICLE XIII
## GENERAL PROVISIONS

13.1    Entire Agreement. This agreement embodies the entire understanding and agreement among the parties concerning the Partnership and supersedes any and all prior negotiations, understandings or agreements in regard thereto.

13.2    Amendment. This Agreement may not be amended nor may any rights hereunder be waived except by an instrument in writing signed by the party sought to be charged with such amendment or waiver.

13.3    Applicable Law. This agreement shall be construed in accordance with and governed by the laws of the State of Colorado.

13.4    Pronouns. References to a Partner, including by use of a pronoun, shall be deemed to include masculine, feminine, singular, plural, individuals, partnerships or corporations where applicable.

13.5    Counterparts. This instrument may be executed in any number of counterparts each of which shall be considered an original.

13.6    Additional Documents. The Partners hereto covenant and agree to execute such additional documents and to perform additional acts as are or may become necessary or convenient to carry out the purposes of this Agreement.

13.7   <u>Written Consents</u>.  All consents or approvals required or permitted under this Agreement shall be in writing.

13.8   <u>Method of Notices</u>.  All notices required or permitted by this Agreement shall be in writing and shall be hand delivered or sent by registered or certified mail, postage prepaid, addressed as set forth on the signature page hereof (except that any Partner may from time to time give notice changing his address for that purpose) and shall be effective when personally delivered, or, if mailed, on the date set forth on the receipt of registered or certified mail, or on the fifth day after mailing, whichever is earlier.

13.9   <u>Computation of Time</u>.  In computing any period of time under this Agreement, the day of the act, event or default from which the designated period of time begins to run shall not be included.  The last day of the period so computed shall be included, unless it is a Saturday, Sunday or legal holiday, in which event the period shall run until the end of the next day which is not a Saturday, Sunday or legal holiday.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

FERMIN MENDOZA;
FRENCHMAN HILL
APARTMENTS RESIDENT
ASSOCIATION,

    Plaintiffs,

    v.

FRENCHMAN HILL
APARTMENTS LIMITED
PARTNERSHIP; CAMBRIDGE
MANAGEMENT, INC.; HOUSING
AUTHORITY OF GRANT
COUNTY; JOHN POLING, in his
official capacity as Executive
Director of the Housing Authority of
Grant County; WASHINGTON
STATE HOUSING FINANCE
COMMISSION; KIM HERMAN in
his official capacity as Executive
Director of the Washington State
Housing Finance Commission,

    Defendants.

NO.  CV-03-494-RHW

**ORDER DENYING IN PART
AND GRANTING IN PART
PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT**

    Before the Court is Plaintiffs' Motion for Summary Judgment (Ct. Rec. 31).

A hearing on the above motion was held on January 6, 2005, in Spokane,

Washington.  The Plaintiffs were represented by Judith Lurie and Stephen

Frederickson.  Defendants Washington State Housing Finance Commission and

Kim Herman (the "Commission") were represented by John Nelson.  Defendants

Frenchman Hill Apartments Limited Partnership, Cambridge Management, Inc.,

Housing Authority of Grant County, and John Poling were represented by Thomas

**ORDER DENYING IN PART AND GRANTING IN PART PLAINTIFFS'
MOTION FOR  SUMMARY JUDGMENT * 1**



1  Ahearne.

2      The Plaintiffs seek partial summary judgment that: (1) the Washington State

3  Housing Finance Commission and the Frenchman Hill Apartments Limited

4  Partnership ("FHA Partnership") violated 26 U.S.C. § 42(h)(6) by failing to have

5  in place an agreement expressly prohibiting the eviction of low-income residents

6  without good cause; and (2) that the FHA Partnership and the management of the

7  Frenchman Hill Apartments violated the due process clause by attempting to

8  terminate the Mendoza family's tenancy without good cause.  The Plaintiffs allege

9  that both claims are enforceable through 42 U.S.C. § 1983 and seek declaratory

10  and injunctive relief.

11      For the reasons stated herein, the Court *sua sponte* grants summary

12  judgment in the Defendants' favor on the claim for relief under 26 U.S.C.

13  §42(h)(6), and grants Plaintiff's motion for summary judgment, on narrow

14  grounds, on the due process claim.

15                        **Standard of Review**

16      Summary judgment is appropriate if the "pleadings, depositions, answers to

17  interrogatories, and admissions on file, together with the affidavits, if any, show

18  that there is no genuine issue as to any material fact and that the moving party is

19  entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  When considering

20  a motion for summary judgment, a court may neither weigh the evidence nor assess

21  credibility; instead, "the evidence of the non-movant is to be believed, and all

22  justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby,*

23  *Inc.*, 477 U.S. 242, 255 (1986).

24      "Even when there has been no cross-motion for summary judgment, a

25  district court may enter summary judgment *sua sponte* against a moving party if

26  the losing party has had a 'full and fair opportunity to ventilate the issues involved

27  in the matter.'" *Gospel Missions of America v. City of Los Angeles*, 328 F.3d 548,

28  //

**ORDER DENYING IN PART AND GRANTING IN PART PLAINTIFFS'
MOTION FOR  SUMMARY JUDGMENT * 2**

1   553 (9th Cir. 2003) (citing *Cool Fuel, Inc. v. Connett*, 685 F.2d 309, 312 (9th Cir.

2   1982)).

3                                          **Facts**

4          Defendant Fermin Mendoza and his family are residents of the Frenchman

5   Hill Apartments (the "Apartments"), located in Royal City, Washington.  On

6   August 27, 2000, Mr. Mendoza entered into a six-month lease that automatically

7   converted to a month-to-month tenancy.  The lease agreement designates his

8   apartment as a low-income housing unit.  On or about November 25, 2003, Mr.

9   Mendoza was served with a 20-day eviction notice, terminating his tenancy

10  effective December 31, 2003.  The notice did not provide any reasons for the

11  termination of his tenancy.[1]

12         The Apartments are owned by the Defendant Frenchman Hill Apartments

13  Limited Partnership ("FHA Partnership").  The FHA Partnership receives annual

14  tax credits for the Apartments through the Federal Low Income Housing Tax

15  Credit Program, 26 U.S.C. § 42.  One-hundred percent of the 25 housing units at

16  the Apartments are set aside for low-income residents.

17         The managing general partner of the FHA Partnership is the Defendant

18  Housing Authority of Grant County ("GCHA").  GCHA owns .01 percent of the

19  FHA Partnership, and is the general partner of the Partnership.  The GCHA

20  manages the day-to-day affairs of the FHA Partnership.  The GCHA is a public

21  housing authority and municipal corporation, established pursuant to Wash. Rev.

22  Stat. § 35.82.  The Apartments are managed by Cambridge Management, Inc.

23  ("Cambridge"), a private corporation.  The 99.99% owner of the FHA Partnership

24

25         [1] The Defendants have since stipulated to a preliminary injunction that

26  prevents the eviction of Mr. Mendoza or other residents of the FHA Apartments.

27  In addition, the Defendants have accepted rent from Mr. Mendoza, voiding the

28  eviction notice.  Therefore, the Plaintiff is not under immediate threat of eviction.

**ORDER DENYING IN PART AND GRANTING IN PART PLAINTIFFS'
MOTION FOR  SUMMARY JUDGMENT * 3**

1  is Related Capital Partners XI, L.P.

2  The Apartments are subject to a "Regulatory Agreement (Extended Use

3  Agreement)," that was executed by the FHA Partnership and the Washington State

4  Housing Commission.  This agreement is intended to serve as the extended low-

5  income housing commitment, required by 26 U.S.C. § 42, for the allocation of low-

6  income housing tax credits.  The agreement, however, does not explicitly prohibit

7  the eviction of tenants from low-income units other than for good cause during the

8  entire extended low-income housing period.

9  Frenchman Hill Apartments Resident Association (the "Association") is a

10  community group made up of tenants of the Frenchman Hill Apartments that was

11  formed to represent the interests of current residents of the apartment complex.

**Discussion**

13  **1.  Mootness**

14  The Defendants assert that the Plaintiffs claims are moot because (1)

15  Defendant Washington State Housing Commission is in the process of complying

16  with the IRS Revenue Ruling 2004-82, which would provide the Plaintiffs with the

17  protections they seek; (2) the FHA Partnership has filed a document confirming

18  that it will comply with the IRS Revenue Ruling 2004-82 as long as that ruling

19  remains in effect; and (3) Plaintiffs have since accepted rent from Mr. Mendoza,

20  thus nullifying the notice for the purpose of the Washington Unlawful Detainer

21  Act.  Wash. Rev. Stat. § 59.12 *et seq.*

22  In order for plaintiffs to have standing to seek an injunction or declaratory

23  relief, they must demonstrate that their claims of continuing injury are not

24  speculative.  *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983).  If plaintiffs

25  cannot show continuing injury, they may nonetheless comply with Article III under

26  the capable of repetition, yet evading review exception to the doctrine of mootness.

27  *See N.A.A.C.P. v. City of Richmond*, 743 F.2d 1346m 1353 (9th Cir. 1984).

28  The Court finds that the issuance of IRS Ruling 2004-82 does not render this

**ORDER DENYING IN PART AND GRANTING IN PART PLAINTIFFS' MOTION FOR  SUMMARY JUDGMENT * 4**

1  action moot.  While the IRS ruling is highly relevant to the situation at hand, it is

2  not binding on this Court.  *See Omohundro v. United States*, 300 F.3d 1065, 1068

3  (9th Cir. 2002).  Moreover, the ruling by its own terms only requires compliance

4  within one calendar year.  Because the Defendants have not yet fully complied

5  with the ruling and the alleged violations of 26 U.S.C. § 42(h)(6) may continue in

6  the interim, the Court finds that a live controversy still exists.

7      Furthermore, the acceptance of rent has not mooted this action.  *See*

8  *Housing Resource Group v. Price*, 958 P.2d 327 (Wash. Ct. App. 1998) (holding

9  that if landlord accepts rent with knowledge of prior breach of lease covenant,

10  landlord generally waives right to evict based on that breach).  The Defendants

11  only accepted rent from Mr. Mendoza after this lawsuit was filed.  If the

12  Defendant's acceptance of rent rendered this action moot, the Plaintiff's claim

13  would fall into the category of situations of wrongs capable of repetition and

14  evading review. "The 'capable of repetition, yet evading review' exception to

15  mootness applies when (1) the challenged action is too short in duration to be fully

16  litigated before cessation or expiration, and (2) there is a reasonable expectation

17  that the same complaining party will be subjected to the same action again." *Cole*

18  *v. Oroville Union High Sch. Dist.*, 228 F.3d 1092, 1098 (9th Cir. 2000).

19      In *Gallman v. Pierce*, a district court applied the capable of repetition, yet

20  evading review exception to the termination of public housing tenants' leases.  639

21  F. Supp. 472, 480 (N.D. Cal. 1986).  The court explained in *Gallman* that the first

22  prong of the capable of repetition, yet evading review exception review was met

23  because

>    month to month tenants receive either a three or a thirty day notice of
>    termination.  A period of a month, and certainly three days, is a very brief
>    time in which to litigate unstated reasons for termination, or alleged
>    statutory and constitutional alleged deficiencies in the notice.

26  Under the Washington Unlawful Detainer Act, a similarly short time frame is

27  involved.  *See* Wash. Rev. Stat. § 59.12 *et seq.*  Moreover, as in *Gallman*, there can

**ORDER DENYING IN PART AND GRANTING IN PART PLAINTIFFS'
MOTION FOR  SUMMARY JUDGMENT * 5**

1  be no serious question about the likelihood that the plaintiffs will at some time

2  receive other termination notices.  Accordingly, the Court finds that the capable of

3  repetition, yet evading review exception applies and a justiciable controversy

4  exists.

5  **2.      The Federal Low Income Housing Tax Credit Program**

6        Plaintiffs allege that the Federal Low Income Housing Tax Credit Act, 26

7  U.S.C. § 42, confers individual rights on low income tenants that are enforceable

8  through 42 U.S.C. § 1983.  The Defendants dispute this assertion, arguing that the

9  only remedy for violation of the tax-credit program is revocation of the tax credits

10  by the Internal Revenue Service.

11        **A.      The Duration fo the Good Cause Eviction Requirement**

12        The parties contest whether the good cause eviction requirement applies to

13  the full duration of a housing development's low-income housing commitment, or

14  only during the transitional periods described at 26 U.S.C. § 42(h)(6)(E).  The

15  Court looks to the plain language of the statute, any relevant legislative history and

16  agency interpretation to interpret the statute.

17        The Federal Low Income Housing Tax Credit Program, 26 U.S.C. § 42, was

18  enacted under Congress's taxing and spending powers, to support the development

19  of low-income housing.  In order to receive tax credits, housing developments must

20  enter into long-term commitments to offer low-income housing to qualified

21  persons.  Under 26 U.S.C. § 42(h)(6)(A), "[n]o [tax] credit shall be allowed . . .

22  unless an extended low-income housing commitment is in effect as of the end of

23  such taxable year."

24        An "extended low-income housing commitment" is defined in 26 U.S.C.

25  § 42(h)(6)(B) as an "agreement between the taxpayer and the housing credit

26  agency." An "extended low-income housing commitment" is defined as an

27  agreement between the taxpayer (here, FHA Partnership) and the housing credit

28  agency (here, the Commission) "which prohibits the actions described in

**ORDER DENYING IN PART AND GRANTING IN PART PLAINTIFFS'
MOTION FOR  SUMMARY JUDGMENT * 6**

1  subclauses (I) and (ii) of subparagraph (E)(ii).  26 U.S.C. § 42(h)(6)(B)(i)

2  Subparagraph (E)(ii), in turn, provides for certain prohibitions against "eviction or

3  the termination of tenancy (other than for good cause)," 26 U.S.C. §

4  42(h)(6)(E)(ii)(I), and must "allo[w] individuals who meet the income limitations .

5  . . to enforce [the good cause requirement] in any State court." 26 U.S.C. §

6  42(h)(6)(B)(ii).

7      When interpreting a statute, courts must examine the plain language of the

8  statute to "derive meaning from context, and this requires reading the relevant

9  statutory provisions as a whole." *See United States v. Hanousek*, 176 F.3d 1116,

10  1120 (9th Cir.1999) (citations omitted).  Here, the Defendants argue that, based

11  upon the legislative history of section 42, 26 U.S.C. § 42(h)(6)(B)(i) implicitly

12  incorporates the limitations contained in subsections (h)(6)(E)(I) and (II), and

13  therefore the good cause limitations only apply for a three year period in certain

14  circumstances such as foreclosure, or sale.  The plain language of 26 U.S.C. §

15  42(h)(6)(B)(i), however, only points to the "subclauses (I) and (II) of subparagraph

16  (E)(ii)" and no more.  In the following subclause 42(h)(6)(B)(ii), which provides

17  that the good cause requirement must be enforceable in state court, no mention is

18  made of limiting the duration of the enforceability of the good cause requirement

19  to a three year period.  Therefore, the plain language of the statute supports the

20  Plaintiffs' contention that the good cause requirement shall be in effect for the

21  entirety of the low-income housing commitment.

22      The Plaintiffs, in turn, assert that this Court should determine that the good

23  cause eviction requirement applies to the full duration of a housing development's

24  low-income housing commitment based on IRS Revenue Ruling 2004-82.  That

25  ruling unequivocally holds that he good cause limitations of 26 U.S.C. §

26  42(h)(6)(E)(ii) applies during the entire extended low-income housing

27  commitment.  While the Court is not bound by this interpretation, it has great

28  persuasive value, and suggests that the FHA Partnership is bound by the good

**ORDER DENYING IN PART AND GRANTING IN PART PLAINTIFFS'**
**MOTION FOR  SUMMARY JUDGMENT * 7**

1  cause requirement for the full 30 years of its commitment. *See Omohundro*, 300

2  F.3d at 1068 (court should defer to agency decision based on thoroughness evident

3  in consideration, reasoning and consistency).

4       Finally, other courts to interpret 26 U.S.C. §§ 42(h)(6)(B)(i) and

5  42(h)(6)(E)(ii)(I) have found that the extended low-income housing commitment

6  must include a prohibition against eviction without good cause for the duration of

7  the extended low-income housing commitment. *See Carter v. Maryland Mgmt.*

8  *Co.*, 337 Md. 596 (2003); *Cimarron Village v. Washington*, 649 N.W. 2d 811

9  (Minn. Ct. App. 2003). The Court finds the analysis and reasoning of these

10 opinions highly persuasive.

11      For these reasons, the Court finds that the prohibition contained in

12 42(h)(6)(E)(ii)(I) must be in effect for the duration of the extended low-income

13 housing commitment.

14  **B.    The Existence of an Enforceable Right**

15      Plaintiffs argue that the good cause provision of 26 U.S.C. §§ 42(h)(6)

16 creates an enforceable right under 42 U.S.C. § 1983. Section 1983 creates a

17 federal remedy for violations of federal statutes by agents of the state. *See Maine*

18 *v. Thiboutot*, 448 U.S. 1 (1980). Section 1983 provides, *inter alia*, that:

19      Every person who, under color of any statute, ordinance, regulation, custom,
        or usage . . . subjects, or causes to be subjected, any citizen of the United
20      States or other person within the jurisdiction thereof to the deprivation of
        any rights, privileges, or immunities secured by the Constitution and laws,
21      shall be liable to the party injured in an action at law, suit in equity, or other
        proper proceeding for redress . . . .
22

23 42 U.S.C. § 1983. Two exceptions to this doctrine exist. First, section 1983 may

24 be used only to remedy statutory violations where an independent statute creates an

    enforceable right, privilege, or immunity. *See Pennhurst State School and*
25
    *Hospital v. Halderman*, 451 U.S. 1 (1981). Second, section 1983 is not available
26
   where Congress has demonstrated an intent to foreclose the use of section 1983
27
   through a comprehensive remedial scheme. *See Middlesex County Sewerage*
28

**ORDER DENYING IN PART AND GRANTING IN PART PLAINTIFFS'**
**MOTION FOR  SUMMARY JUDGMENT * 8**

1  *Authority v. National Sea Clammers Assn.*, 453 U.S. 1 (1981).

2  The Supreme Court most recently addressed the issue of whether federal

3  statutes create rights enforceable under section 1983 in *Gonzaga University v. Doe*,

4  536 U.S. 273 (2002).  In *Gonzaga*, the Supreme Court found that a student could

5  not sue a private university for damages under section 1983 to enforce provisions

6  of the Family Educational Rights and Privacy Act of 1974 ("FERPA"), 20 U.S.C. §

7  1232g, which prohibits the federal funding of educational institutions that have a

8  policy or practice of releasing education records to unauthorized persons.  The

9  Court found that FERPA's nondisclosure provisions failed to confer enforceable

10  rights because they (1) lack the sort of "rights-creating" language critical to

11  showing congressional intent to create new rights; (2) are concerned with the

12  "aggregate" effect of institutional policy and practice and are not concerned with

13  "whether the needs of any particular person have been satisfied;" and (3) serve

14  primarily to direct the distribution of public funds.  *Id.* at 290-91.

15  Under the *Gonzaga* standard, the provisions of 26 U.S.C. § 42 do not appear

16  to confer individual rights upon the Plaintiffs in this action.  First, the only "rights-

17  creating" language contained in 26 U.S.C. § 42(h) is several steps removed from

18  the residents themselves.  Under the statute, in order for a housing development to

19  enjoy tax credits it must enter into an agreement with the housing credit authority

20  (here, the Washington State Housing Commission) to provide certain benefits to

21  low-income residents, including prohibitions against eviction without cause that

22  are enforceable in state courts.  At most, section 42 uses Congress's taxing and

23  spending power to create a private cause of action for specific performance against

24  a taxpayer.  The legislative history of the Act supports this conclusion: the

25  "Explanation of Provisions" section of House Report 101-247 (Sept. 20, 1989)

26  explains the reason subsection (h)(6) was added and states that "[t]his provision

27  contemplates a remedy of specific enforcement in the State courts but does not

28  create a remedy under Federal Law."

**ORDER DENYING IN PART AND GRANTING IN PART PLAINTIFFS'**
**MOTION FOR  SUMMARY JUDGMENT * 9**

1    Accordingly, the Court finds that the language of 26 U.S.C. § 42(h) is not

2  equivalent to the language of Title VII, cited by the Supreme Court in *Gonzaga*, as

3  classic rights-creating language: "No person in the United States shall . . . be

4  subjected to discrimination under any program or activity receiving Federal

5  financial assistance." *See Gonzaga*, 536 U.S. at 284, n. 3 (citing 42 U.S.C.

6  § 2000d). Instead, the benefits conferred upon low-income residents through the

7  tax credit program are tangential to the agreement between the taxpayer and the

8  housing credit authority. However, it is "rights, not the broader or vaguer

9  'benefits' or 'interests,' that may be enforced under the authority" of section 1983.

10  *Gonzaga*, 536 U.S. at 283.

11    Second, the tax credit program also has an "aggregate" rather than individual

12  focus. Instead of requiring strict compliance on a case-by-case basis, the act only

13  requires "substantial" compliance. Should a taxpayer fail to have an "extended

14  low income housing commitment" with good cause eviction protection in effect,

15  section 42(h)(6)(J) provides that the "[e]ffect of noncompliance" is that the

16  taxpayer will be denied the credit for the current year unless "the failure is

17  corrected within 1 year from the date of the determination." Therefore, a taxpayer

18  could fail to have an extended low income housing commitment in effect for

19  eleven months and still comply with the Act. In *Gonzaga*, the court focused on the

20  fact that funding recipients could avoid termination of funding through substantial

21  compliance with the FERPA; the Court found that substantial compliance

22  provisions could not demonstrate the requisite congressional intent to confer

23  individual rights. *Gonzaga*, 536 U.S. at 288-89.

24    Finally, as in *Gonzaga*, the Federal Low Income Housing Tax Credit Act

25  serves primarily to direct the distribution of government funds rather than to confer

26  rights. Section 42 governs the distribution of tax credits to private housing

27  developers and encourage development of low-income housing, rather than to

28  confer rights on low-income tenants or develop publicly- owned housing projects

**ORDER DENYING IN PART AND GRANTING IN PART PLAINTIFFS'
MOTION FOR  SUMMARY JUDGMENT * 10**

1  (such as Section 8 housing).  For these reasons, the Court finds that the Act does

2  not meet the individual rights test espoused by the Supreme Court in *Gonzaga* and

3  does not provide a private right of action that can be enforced under section 1983.

4      The conclusion that no individual enforceable right exists under section 42 is

5  buttressed by the fact that Congress has created an alternate enforcement scheme

6  for the tax credit program.  The Act requires qualified housing credit agencies to

7  submit qualified allocation plans, which must outline the "procedure that the

8  agency (or an agent or other private contractor of such agency) will follow in

9  monitoring for noncompliance with the provisions of this section and in notifying

10  the Internal Revenue Service of such noncompliance . . . ."  26 U.S.C. §

11  42(m)(1)(B)(iii).  As part of this allocation plan, the Washington State Housing

12  Finance Commission requires Frenchman Hill to abide by the terms of the Low

13  Income Housing Tax Credit Program as a condition of its Regulatory Agreement.

14  The partnership must submit an annual certification to the Commission, providing

15  under penalty of perjury, that an extended low-income housing commitment was in

16  effect at all times during the preceding 12 months (See Ex. 1 to Commission's

17  Answer, §§ 4.17, 5.8).  Therefore, the housing credit agency acts as a watchdog for

18  the IRS.  The IRS, in turn, has ample auditing power to strip undeserving

19  developments of their tax credits or prosecute wayward taxpayers.

20      In their responsive briefing, the Defendants seek dismissal of the Plaintiffs'

21  section 1983 claims on the ground that 26 U.S.C. § 42 does not create enforceable

22  rights.  Since this motion is not properly raised as a cross-motion for summary

23  judgment, the Court finds it is proper to enter judgment *sua sponte*.  The fact that

24  Defendants raised the specter of dismissal, however, provides evidence that the

25  Plaintiffs have had a full and fair opportunity to "ventilate" the issues involved in

26  the matter.  In an abundance of caution, the Court grants Plaintiffs leave to file an

27  objection to the entry of summary judgment, *sua sponte*, within ten days of the

28  entrance of this order.  If no objection is received, the Court will find that no

**ORDER DENYING IN PART AND GRANTING IN PART PLAINTIFFS'
MOTION FOR  SUMMARY JUDGMENT * 11**

1 private right of action exists under 26 U.S.C. § 42(h)(6), and *sua sponte* grant

2 summary judgment for Defendants on this claim.

3 **3.    Due Process**

4      The Plaintiffs allege that the FHA Partnership, Cambridge Management, Inc.

5 ("Cambridge"), the Housing Authority of Grant County, and John Poling, have

6 violated the due process guarantees of the United States Constitution by attempting

7 to evict the Plaintiff from his apartment without good cause.  The Plaintiffs argue

8 that low-income tenants at Frenchman Hill have a legitimate claim of entitlement

9 to the continued use and enjoyment of their homes, and public housing authorities

10 are government agencies whose actions are subject to due process requirements.

11 The Defendants assert that because Frenchman Hill Apartments is a private

12 housing complex, the FHA Partnership should not be subject to the due process

13 clause.  Moreover, the Defendants assert that the tenants do not have a property

14 interest in their tenancies because the good cause requirement is not in effect for

15 the entire long-term commitment period.

16      To survive summary judgment, the Plaintiffs must present facts

17 demonstrating (1) sufficient governmental participation and involvement to subject

18 the Defendants to the due process clause; (2) a constitutionally protected property

19 interest in not being evicted from their apartments; and (3) that they were denied

20 procedural safeguards required by due process.  *See Geneva Towers Tenants Org.*

21 *v. Federated Mortgage Investors*, 504 F.2d 483 (9th Cir. 1974).

22 **A.    Government Action**

23      As a starting matter, to prevail under section 1983, the Plaintiffs must show

24 that the Defendants' "actions were fairly attributable to the federal or state

25 government." *See Mathis v. Pacific Gas & Elec. Co.*, 75 F.3d 498, 502 (9th Cir.

26 1996) (*citing Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 936 (1982)).  Action by

27 a private party, without something more, is not sufficient to justify a

28 characterization of that party as a state actor.  The Supreme Court has that a private

**ORDER DENYING IN PART AND GRANTING IN PART PLAINTIFFS'**
**MOTION FOR  SUMMARY JUDGMENT * 12**

1  actor may be characterized as a state actor when there is a sufficient "nexus" or

2  symbiotic relationship between state and private activity.  *See Jackson v.*

3  *Metropolitan Edison Co.*, 419 U.S. 345 (1974); *Burton v. Wilmington Parking*

4  *Authority*, 365 U.S. 715 (1961).  Any inquiry into whether a private entity should

5  be characterized as a state actor is fact specific.  *See Howerton v. Gabicia*, 708

6  F.2d 380, 383 (9th Cir. 1983).  "[S]ubstantial coordination and integration between

7  the private entity and the government are the essence of a symbiotic relationship."

8  *Brunette v. Humane Society of Ventura County*, 294 F.3d 1205, 1213 (9th Cir.

9  2002).  Courts have looked to evidence of a government entity's financial

10 interdependence with or plenary control over a private entity to determine if a

11 symbiotic relationship exists.  *Id; but see Leeds v. Meltz*, 86 F.3d 51, 54 (2d Cir.

12 1996) (holding that neither government funding nor regulation alone is sufficient

13 to confer section 1983 liability on private actors).

14     The Court finds that a symbiotic relationship exists between Grant County

15 Housing Authority and the FHA Partnership, and based on this relationship the

16 actions of the FHA Partnership are sufficiently attributable to the state.  Because

17 the Grant County Housing Authority is the general partner of the FHA Partnership

18 and manages the Partnership's day-to-day affairs, there is significant government

19 control over the private entity's actions.  As such, the daily decision of the FHA

20 Partnership are, in truth, the decisions of the state actor.  Furthermore, the FHA

21 Partnership and GCHA are financially interrelated.  GCHA is a .01 percent owner

22 of the FHA Partnership.  Moreover, the Plaintiffs point out, that the FHA

23 Partnership developed the Apartments through the sale of tax credits, monies from

24 the Washington State Housing Trust Fund, Community Development Block Grant

25 Funds, and the Federal Home Loan Bank of Seattle.  This funding package was

26 coordinated, in part, by the Grant County Housing Authority.  The Defendants

27 argue that FHA Partnership is not a state actor, because the partnership agreement

28 allows the 99.99% owner, Related Capital Partners XI, L.P., to remove Grant

**ORDER DENYING IN PART AND GRANTING IN PART PLAINTIFFS'
MOTION FOR  SUMMARY JUDGMENT * 13**

County.  The fact that a government entity or a private party may choose to extricate itself from a symbiotic relationship, however, does not negate the existence of that relationship.

The parties do not dispute that GCHA or John Poling are state actors. Cambridge Management, Inc., however, is a management company acting at the behest of FHA Partnership as an independent contractor.  The Plaintiffs have alleged no facts sufficient to show Cambridge is a state actor.

## B.  Constitutionally Protected Property Interest

The Plaintiffs must establish that they have a legitimate, objectively justifiable claim to the benefits of the government program.  In *Board of Regents v. Roth*, the Court held that:

> [t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.

408 U.S. 564, 477 (1972).  The Supreme Court has explained that in order to have a property interest in a governmental benefit (as opposed to a right), the receipt of that benefit must be guaranteed absent cause for termination.  *See Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 11-12 (1978).

Plaintiffs allege that they have a legitimate interest in the continued use and enjoyment of their rent-controlled apartments, because the receipt of that benefit is guaranteed, absent good cause eviction.  The Plaintiffs analogize the below-market housing provided by the Apartments to the rent subsidies provided under the Section 8 Set-Aside Program, 42 U.S.C. § 1437f.  *See Gallman v. Pierce*, 639 F. Supp. 472 (N.D. Cal. 1986) (holding that section 8 tenants had a property interest in not being evicted without good cause); *Joy v. Daniels*, 479 F.2d 1236, 1241 (4th Cir. 1973) (holding tenant in private housing receiving federal rent subsidy has a property interest in continuing his tenancy, absent good cause to terminate); and *Escalara v. New York City Housing Auth.*, 425 F.2d 853 (2d Cir. 1970) (holding

**ORDER DENYING IN PART AND GRANTING IN PART PLAINTIFFS' MOTION FOR  SUMMARY JUDGMENT * 14**

1  public housing tenant has property right in ongoing tenancy).  As discussed *supra*,

2  the Court finds that under section 42(h)(6)(B)(i) the extended low-income housing

3  commitment must include a prohibition on eviction without good cause during the

4  entire extended use period.  Accordingly, the Court finds that because the

5  Frenchman Hill Apartment low-income tenants are entitled to continue to reside in

6  their apartments, absent good cause for eviction, they have a property right in their

7  tenancy.[2]

8  ### C.  Procedural Safeguards

9  Plaintiffs assert that Mr. Mendoza received insufficient procedural

10  protections in his without cause eviction notice.  The parties agree that the only

11  process Defendant received was a 20-day notice under Washington law that did not

12  specify a cause for his eviction.  Plaintiff Mendoza, however, does not request an

13  administrative hearing on his eviction notice, which has since been voided.

14  Instead, he requests a declaratory judgment that "[e]victions financed under the

15  Tax Credit Program are governed by the Due Process Clause of the Fourteenth

16  Amendment" and that "[d]ue process requires that tenants of Tax Credit projects be

17  informed of the reasons for eviction; that tenants of Tax Credit projects have a

18  meaningful opportunity to contest the grounds alleged for eviction; and that the

19  owner or managing agent of Tax Credit projects establish good cause prior to

20  eviction." (*Plaintiffs' Memorandum in Support of Summary Judgment* at 17.)

21  In the public housing context, courts have applied *Goldberg v. Kelly*, 397

22  U.S. 254 (1970), to hold that public housing tenants (who are subject  to eviction

23  only with good cause) are entitled to (1) timely and adequate notice detailing the

24  reasons for a proposed termination or eviction; (2) a hearing before an impartial

25  decision maker; (3) the ability to cross-examine adverse witnesses; (4) the

26  _____

27  [2] This property right exists as long as the FHA Partnership participates in

28  the tax credit program.

**ORDER DENYING IN PART AND GRANTING IN PART PLAINTIFFS'
MOTION FOR  SUMMARY JUDGMENT * 15**

1    opportunity to be represented by counsel at the hearing; and (5) a decision, based

2    on evidence adduced at the hearing.  *See Caulder v. Durham Housing Auth.,* 433

3    F.2d 998 (4th Cir. 1970); *Escalera v. New York City Housing Auth.*, 425 F.2d 853

4    (2d Cir. 1970).

5         In the case at hand, Mr. Mendoza was not provided with timely and adequate

6    notice detailing the reasons for a proposed eviction.  Instead, he was provided a

7    notice of eviction without cause.  The Court finds that by failing to provide

8    detailed reasons for the proposed eviction, the owners and managers of the

9    Apartments violated Mr. Mendoza's right to due process.

10        Beyond providing for good cause protections that may be specifically

11   enforced, the Low-Income Housing Tax Credit program does not purport to govern

12   eviction or termination procedures.  Therefore, the Court must look to the

13   procedures provided by the state of Washington.  *See Gallman*, 639 F. Supp. at

14   477.  Washington law provides a summary procedure for evicting tenants.  Wash.

15   Rev. Code §§ 59.12, 59.18 *et seq.*  Under the procedure described in section

16   59.18.380, the landlord is entitled to a show cause hearing, and at that hearing the

17   parties argue the merits of the case.  *See Housing Authority of King County v.*

18   *Saylors,* 578 P.2d 76 (Wash. Ct. App. 1978).  At this hearing, the tenant may raise

19   the affirmative defense that there is no good cause for eviction or termination.  *Id.*

20   at 874.  Other states have allowed tenants to raise the defense of absence of good

21   cause even if the good cause requirement is not explicitly listed in the extended

22   long-term housing commitment.  *See, i.e., Carter v. Maryland Mgmt. Co.,* 835

23   A.2d 158 (2003); *Cimarron Village v. Washington*, 649 N.W. 2d 811 (Minn. Ct.

24   App. 2003).  Accordingly, with the exception of the notice and contents of the

25   eviction notice, the Washington statutes provide adequate procedural safeguards to

26   Mr. Mendoza.

27   **4.    Declaratory Relief Regarding Propriety of Tax Credits**

28        The Plaintiffs seek a declaratory judgment under 28 U.S.C. § 2201 and

**ORDER DENYING IN PART AND GRANTING IN PART PLAINTIFFS'
MOTION FOR  SUMMARY JUDGMENT * 16**

Federal Rule of Civil Procedure 57 that:

b.    Agreements prohibiting the eviction or termination of tenancy without good cause and meeting the other requirements of 26 U.S.C. § 42 (h)(6) must be in effect before tax credits can be allowed under the Tax Credit Program.

c.    The Defendants' Regulatory Agreement fails to comply with 26 U.S.C. § 42(h)(6) and fails to satisfy a mandatory condition precedent for the allowance of tax credits that it fails to include express language prohibiting the eviction or termination of tenancies of tenants of any low-income units other than for good cause.

d.    The Defendant FHA is not eligible to receive tax credits under the Tax Credit Program unless and until it and the Commission have in place an agreement that prohibits the eviction or the termination of tenancy (other than for good cause) of any tenant of any low-income unit.

(*Plaintiffs' Memo.* at 17). The Plaintiffs are third-party beneficiaries of the Low-Income Housing Tax Credit Program and, therefore, have no standing to challenge tax determinations by the IRS. *See Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26 (1976). Accordingly, the Court finds that Plaintiffs are not entitled to the above declaratory relief as a matter of law.

## 5.    Injunctive Relief

The Plaintiffs also seek injunctive relief (1) prohibiting eviction of Plaintiff Mendoza or other residents of the Apartments without good cause; (2) requiring the Commission and the FHA Partnership to amend their Regulatory Agreement to prohibit the eviction of a low-income tenant without cause; and (3) prohibiting the Commission from allowing tax credits for the Apartments unless and until the FHA Partnership has in place an agreement that expressly prohibits the eviction or termination of tenancy (*Plaintiffs' Memo.* at 18). "The requirements for the issuance of a permanent injunction are the likelihood of substantial and immediate irreparable injury and the inadequacy of remedies at law." *American-Arab Anti-Discrimination Comm'n v. Reno*, 70 F.3d 1045, 1066-67 (9th Cir. 1995) (quotations and citations omitted).

The Plaintiffs assert that they are under a substantial and immediate threat of eviction, and the remedy provided at law is inadequate because the mere filing of

**ORDER DENYING IN PART AND GRANTING IN PART PLAINTIFFS' MOTION FOR  SUMMARY JUDGMENT * 17**

1   an unlawful detainer action carries with it the stigma of eviction and creates

2   negative rental history.  The Plaintiffs have not shown that Mr. Mendoza or any

3   other Plaintiff is under threat of immediate eviction.  Therefore, the likelihood of

4   any injury is speculative, at best.  For this reason, the Court denies Plaintiffs'

5   requests for a permanent injunction.

6        For the remaining injunctive relief requested, the Plaintiffs do not present

7   argument on the likelihood of substantial and immediate irreparable injury or the

8   inadequacy of remedies at law.  Therefore, the requested relief is denied.

9        Having reviewed the record, heard from counsel, and been fully advised in

10   this matter, **IT IS HEREBY ORDERED** that:

11        1.  Plaintiffs' Motion for Summary Judgment (Ct. Rec. 31) is **DENIED IN**

12   **PART AND GRANTED IN PART**.

13        2.  The Court holds that, under the circumstances of this case, the good cause

14   eviction of low-income tenants from the Frenchman Hill Apartments is governed

15   by the Due Process Clause of the Fourteenth Amendment.  Due process requires

16   that Mr. Mendoza be provided with timely and adequate notice detailing the

17   reasons for a proposed termination or eviction.

18        3.  The Court grants Plaintiffs **LEAVE** to file an objection **within ten days**

19   **of this Order** to a *sua sponte* entrance of summary judgment in favor of

20   Defendants Washington State Housing Commission and Kim Herman summary

21   judgment on Plaintiffs' claim to a private right of action under 26 U.S.C. §

22   42(h)(6).  Plaintiffs' briefing shall not exceed 10 pages in length.  If no objection is

23   filed, the Court shall enter an order granting summary judgment for Defendants on

24   this claim.  Defendants need not file a response unless the Court orders them to do

25   so.

26   //

27

28        **IT IS SO ORDERED.**  The District Court Executive is directed to enter this

**ORDER DENYING IN PART AND GRANTING IN PART PLAINTIFFS'**
**MOTION FOR  SUMMARY JUDGMENT * 18**

1  Order and forward copies to counsel.

2  **DATED** this 20th day of January, 2005.

3

4                          s/  ROBERT H. WHALEY
                     UNITED STATES DISTRICT JUDGE
5

6

7

8

9  Q:\Civil\2003\Mendoza\mendoza.sj.ord.2.wpd

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ORDER DENYING IN PART AND GRANTING IN PART PLAINTIFFS'**
**MOTION FOR  SUMMARY JUDGMENT * 19**